UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

LAUREN STOKES,

        Plaintiff,

    v.

GLENN BOYCE, CHANCELLOR OF
THE UNIVERSITY OF MISSISSIPPI,
in his official and personal capacities,

        Defendants.

Case No. ___3:25-cv-307-GHD-RP___

## COMPLAINT

## * * * TRIAL BY JURY REQUESTED * * *

Lauren Stokes, through undersigned counsel, files this complaint against Glenn Boyce, Chancellor of the University of Mississippi, in his official and personal capacities.

## INTRODUCTION

On September 11, 2025, the University of Mississippi fired Lauren Stokes, an administrative employee, for speech she reposted on a private social media account.

The speech was on a matter of public concern and made in the middle of a public debate that was wildly raging across the nation. As shown in this complaint, such speech is highly protected. That it might have offended is no justification for

punishing it. The First Amendment's "proudest boast" is that it protects the freedom to express "even the thoughts we hate."

We live in a war of words. People's lives are destroyed not by things they did but by things they said or did not say, even privately, even after apologizing. A private employer might require its employees to conform to a point of view. But the state, acting through its public university, cannot.

By terminating Lauren for reposting the speech in question, the University says its employees must conform to a point of view. That ought to distress all of us. After all, today's policed are tomorrow's policemen. No state institution should purport to wield such power.

## PARTIES

1.     Lauren Stokes, plaintiff, is an adult resident of this district.

2.     Glenn Boyce, defendant, is an adult resident of this district. He is the appointed Chancellor of the University of Mississippi, a state institution, and was its decisionmaker at all times relevant to this complaint. He is the necessary defendant pursuant to 42 U.S.C. § 1983.

SUBJECT MATTER JURISDICTION

3.      Federal district courts have subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it alleges a cause of action arising under federal law.

VENUE

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this case occurred in this district.

FACTS

Lauren Stokes

5.      Lauren Stokes is a graduate of Ole Miss and has been a member and champion of the Ole Miss community her entire adult life.

6.      She first worked on campus in 2010.  Administrators so liked her they asked her to apply to be chief of staff to the former chancellor, a position for which she was the finalist immediately before he resigned.

7.      In 2016 she and her husband, John Stokes, opened a restaurant just outside of campus.  An article about the restaurant observed that Lauren "beams a smile that could power a sawmill."

8.     Over the years Lauren and John have lovingly welcomed and fed just about all of Oxford and the University, including, regularly, Chancellor Glenn Boyce.

9.     They have also given jobs to countless Ole Miss students and young adults.

10.     In 2023, Lauren was invited to apply for a vacancy in the University's Office of University Development.  The position was executive assistant to Vice Chancellor of Development Charlotte Parks.  The University hired her, and she began work on February 12, 2024.

11.     Her tasks were administrative only: She managed Parks's calendar, arranged her travel, scheduled her recurring meetings, reserved her lunches and dinners with donors or other constituents, and processed requests for tickets to events.

12.     She loved her job.  She loved working for the University and for Parks.

September 10, 2025

13.     On September 10, 2025 podcaster Charlie Kirk was killed.  Kirk was famous for the public debates he hosted on college campuses.  His statements often provoked.  Among them, he stated stoning gay people was "God's perfect law when it comes to sexual matters." He called prominent black women including Supreme Court Justice Ketanji Brown "affirmative action picks." ("You do not have the brain

processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously.")

14.     Kirk's assassination would dominate the news and public conversation for days.  People everywhere debated Kirk's life, especially on social media.

15.     That evening, at approximately 5:00 p.m., Lauren saw and reposted someone else's opinion of Kirk on her private Instagram account:

> For decades, yt supremacist and reimagined Klan members like Kirk have wreaked havoc on our communities, condemning children and the populace at large to mass death for the sake of keeping their automatic guns. They have willingly advocated to condemn children and adult survivors of SA to forced pregnancy and childbirth. They have smiled while stating the reasons people who can birth children shouldn't be allowed life-saving medical care when miscarrying. They have incited and clapped for the brutalizing of Black and Brown bodies. So no, I have no prayers to offer Kirk or respectable statements against violence.  @thecollectress

16.     A little later, she learned the repost had offended someone who saw it and removed it.  At approximately 9:30 p.m., she posted a personal apology:

> I am so truly and deeply sorry to those I have offended. We are lucky enough to know and employ people from all walks of life-trans, MAGA, cat lovers, dog lovers, republicans, independents, and democrats.  In all facets we strive to be kind and hold space for all.  My husband and I do not support violence of any sort.  It was reposted in a heated moment (on the Internet?! Never heard of such!) I apologize to those I have offended and look forward to getting off the internet to reevaluate kindness, privacy, and respect for all

17.     Incidentally, that night Boyce dined at John and Lauren's restaurant.

September 11, 2025

18.     The next day Lauren got up and went to work.

19.     By that time, she was being attacked online and so sought guidance from the human resources office. While there, members of the University Police Department met with her.  They were aware of the attacks and counseled her to ask the Oxford Police Department to monitor the restaurant.

20.     At approximately 9:00 a.m., the University told her it was placing her on paid administrative leave "in [her] best interest."

21.     Lauren left campus and communicated the seriousness to John.

22.     Meanwhile, other members of the University, including Parks, checked on Lauren.  They expressed sympathy and concern for her safety.  She felt protected and was grateful.

23.     That abruptly changed at noon.  At approximately 11:50 a.m. Parks told her that the University had asked for her resignation.

24.     Lauren, now confused, tried to speak with a lawyer.

25.     But the University would not wait.  At approximately 12:50 p.m. it told her she was fired.

26.     At 1:10 p.m., Chancellor Boyce issued a press release about the firing on Facebook:

> Yesterday, a University of Mississippi staff member re-shared hurtful, insensitive comments on social media regarding the tragic murder of Charlie Kirk.  These comments run completely counter to our institutional values of civility, fairness and respecting the dignity of each person.  We condemn this action, and this staff member is no longer employed by the university.

> All of us have a responsibility to take seriously our commitment to upholding
> a civil and respectful campus environment.

27.     The press release leaves no doubt that Boyce fired Lauren for the repost's point of view.

Public employees have First Amendment rights

28.     Unlike a private employer, a public employer cannot freely fire an employee for her speech.

29.     The First Amendment protects a public employee's freedom of speech. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("Public employees do not surrender all their First Amendment rights by reason of their employment."). See also Lindke v. Freed, 601 U.S. 187, 196–98 (2024) ("Freed did not relinquish his First Amendment rights when he became city manager.").

30.     A public employer is not powerless to restrict an employee's speech. It may, for instance, discipline an employee who speaks in an official capacity "because that kind of speech is—for constitutional purposes at least—the government's own speech." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 527 (2022). And, in certain circumstances not applicable here, it may even require that its employees share a point of view. An elected district attorney, for instance, might reasonably terminate an employee whose political views interfere with the office's policymaking functions, e.g., which kinds of crime to charge and whether to

recommend lenient or severe punishments. But that is because such decisions are "laden with ideological content" which is the subject of electoral choices. Maldonado v. Rodriguez, 932 F.3d 388, 394 (5th Cir. 2019) (district attorney could fire employees holding policymaking positions or having access to confidential materials that embody policymaking decisions: "Once the DA is selected, the office must be sensitive to that official's policy demands as represented to the voters."). See also Gonzalez v. Benavides, 712 F.2d 142, 147–48 (5th Cir. 1983) ("There is a governmental interest in securing those unique relationships between certain high level executives and the elected officials at whose grace they serve.").

31.     But a public university is a different kind of public employer. "[G]iven the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329 (2003). See also Healy v. James, 408 U.S. 169, 180 (1972) ("the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large"); Sweezy v. State of N.H. by Wyman, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring) ("These pages need not be burdened with proof, based on the testimony of a cloud of impressive witnesses, of the dependence of a free society on free universities.").

32.     "Nowhere is free speech more important than in our leading institutions of higher learning." Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1128–29 (11th Cir. 2022).

33.     When a public university employee speaks solely in her capacity as a private citizen, and in particular on a matter of public concern, her speech is protected speech, and her employer, to justify adverse action, has a heavy burden.

   The speech in question was protected speech

34.     The speech in question unquestionably was protected speech because it was on a matter of public concern.

35.     Matters of public concern relate to a subject of news interest or to any matter of political, social, or other concern to the community. Protected speech on a matter of public concern can be in any form, including social media. It need not be dignified or refined. It can be crude and highly offensive. E.g., Snyder v. Phelps, 562 U.S. 443, 454 (2011) ("Priests Rape Boys," "Thank God for Dead Soldiers," "God Hates Fags").

36.     Speech on matters of public concern lies at the heart of the First Amendment. First Amendment jurisprudence reflects the foundational understanding that "debate on public issues should be uninhibited, robust, and wide-open." Rankin v. McPherson, 483 U.S. 378, 387 (1987) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

37.    "The arguably 'inappropriate or controversial character of a statement is irrelevant'" to whether it merits protection.  Snyder, 562 U.S. at 454.  The U.S. Supreme Court has held, for instance, that the First Amendment protected even the speech of a public employee who expressed approval of an attempted assassination of President Reagan.  Rankin, 483 U.S. 378.

38.    "[T]he proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'"  Matal v. Tam, 582 U.S. 218, 246 (2017) (quoting United States v. Schwimmer, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

39.    The speech in question related to a subject of obsessive news interest and a matter of political concern to the nation.  It was protected speech.

40.    It was not merely protected speech—it was protected speech made in the middle of a robust public debate, at that very moment wildly raging everywhere.

41.    The speech was not even Lauren's; it was someone else's.  By terminating Lauren for reposting the speech, the University says that Lauren is not allowed even to agree with a point of view held by a substantial portion of the nation.

42.    Stated differently, the University says it gets to tell its employees what to think on matters of public concern.

43.    The interests in freedom of speech, indeed of thought, are extraordinarily high here.

44.     The University must make an extraordinarily strong showing of disruption in its actual operations to justify its termination.  "The more central a matter of public concern the speech at issue, the stronger the employer's showing of counter-balancing governmental interest must be."  Jordan v. Ector Cnty., 516 F.3d 290, 299 (5th Cir. 2008) (citation omitted).

The termination was a rush to judgment

45.     When a public employer terminates an employee for her speech, the law requires it to show the speech disrupted its actual operations.

46.     The speech in question was reposted on a private social media account, after work.  It did not identify the University or target any member of the University community.  E.g., Mahanoy Area Sch. Dist. v. B. L. by & through Levy, 594 U.S. 180, 191 (2021) ("Consider too when, where, and how B. L. spoke. Her posts appeared outside of school hours from a location outside the school. She did not identify the school in her posts or target any member of the school community with vulgar or abusive language.").

47.     There was no opportunity for the off-campus speech to disrupt the University's actual on-campus operations because Boyce, allowing no breathing space, terminated Stokes immediately.

48.     There is no reason to believe the speech would have substantially disrupted the University's actual operations.  E.g., Pickering v. Bd. of Educ., 391

U.S. 563, 572 (1968) (teacher's speech did not disrupt her school's actual operations); Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 378 (5th Cir. 2000) ("[The plaintiff's] letter would not have impeded the Library's general performance and operation: it did not have any bearing on the day-to-day business of circulating books within the community."); Moore v. City of Kilgore, 877 F.2d 364, 375 (5th Cir. 1989) (firefighter's speech did not disrupt firefighters' ability to fight fires).

49.    Boyce's decision to terminate was a rush to judgment based on perceived public reaction to the speech.  But the inconvenience of a public reaction to protected speech cannot justify terminating an employee.  Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1252 (10th Cir. 2024) ("Expected public reaction that impacts external relationships does not constitute a detrimental impact and does not weigh in the District's favor.") (citing Flanagan v. Munger, 890 F.2d 1557, 1566–67 (10th Cir. 1989) ("Defendants' case revolves solely around evidence of the potential disruption of the department's external relationships and operations. Even if disruption of external operations could justify defendants' actions under Pickering and its progeny, their justification must fail under another theory.  The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive ….")).

50.    "Creating room for free speech in a hierarchical organization necessarily involves inconveniencing the employer to some degree. Speech concerning public affairs usually creates attendant inefficiencies in the running of the public entity."  Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 196 (5th Cir. 2005).  "[F]or the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  Mahanoy Area Sch. Dist, 594 U.S. at 192-93 (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 509 (1969)).

51.    "It is precisely the probability of oppressive over-reaction by the powers that be which requires our constant vigilance of the First Amendment protections accorded all public employees." Jones v. Matkin, 623 F. Supp. 3d 774, 790 (E.D. Tex. 2022) (quoting Swilley v. Alexander, 629 F.2d 1018, 1021 (5th Cir. 1980)).

52.    "Indeed, our experience tells us that the more important the subject matter is to the public, the sharper the reaction will be by those whose conduct may be called into question." Id.

Viewpoint discrimination is the most dangerous kind

53.    "[T]he First Amendment does not permit one side of a debate to use the government to cancel the other side."  Noble v. Cincinnati & Hamilton Cnty. Pub. Libr., 112 F.4th 373, 383 (6th Cir. 2024) (citing W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943); Texas v. Johnson, 491 U.S. 397, 399 (1989); Snyder, 562 U.S. at 458)) ("[T]he First Amendment protects individuals who refuse to salute the flag, or even burn it, and who engage in homophobic protests at military funerals, despite that such actions deeply offend many people.").

54.    "The Constitutional guarantee of free expression is a pillar of our democracy, and yet, it can be a bitter medicine—particularly when prescribed in defense of social media's more antisocial viewpoints."  Fenico, 70 F.4th at, 153.

55.    This is why, to use just recent cases, a police department in Philadelphia could not discipline police officers whose social media posts openly denigrated minority groups solely on the basis of their views, Fenico v. City of Philadelphia, 70 F.4th 151 (3d Cir. 2023); a police department in Tulsa could not terminate an officer whose social media posts were racially inflammatory solely on the basis of his views, Brown v. City of Tulsa, 124 F.4th 1251 (10th Cir. 2025);  and a public university in New Jersey could not terminate a lecturer whose private speech glorified Hitler solely on the basis of his views, Jorjani v. New Jersey Inst. of Tech., 151 F.4th 135, 144 (3d Cir. 2025) ("NJIT posits that because Jorjani offered views it disliked, the

First Amendment should not apply, and it is entitled to summary judgment. We cannot agree, lest we permit 'universities to discipline professors, students, and staff any time their speech might cause offense.'").

56.     This is not to conflate the speech in those recent cases with the speech in question here, but instead to make the point that the First Amendment works both ways.  Insofar as the First Amendment is concerned, there can be no right-wing or left-wing double standard.  The state does not get to pick winners and losers among various points of view.  This is something everyone ought to agree on.

57.     When the University terminated Stokes, it explicitly communicated that her view is unacceptable.  To be sure, her view is not singular; it is no doubt shared by a substantial portion of the University community.  But even if it were, a public employer—no less a university—cannot have different rules for different viewpoints.

58.     "Discrimination against speech because of its message is presumed to be unconstitutional." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995) (citation omitted).  "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination."  Id.

59.     It is especially egregious when a university discriminates based on viewpoint.  Because "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" Healy, 408 U.S. at 180, "the dangers of viewpoint discrimination are heightened in the university setting."  Gay Lesbian Bisexual All. v. Pryor, 110 F.3d 1543, 1550 (11th Cir. 1997) (citing Rosenberger, 515 U.S. 835 ("That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.")).

60.     Discovery likely will show that, under Boyce's leadership, the University routinely discriminates against viewpoints when it deals with controversial speech by defending the speaker's right to speak when it perceives the viewpoint to be politically favored and condemning the speech as "unacceptable" when it perceives it is not.

Boyce is personally liable for Stokes's termination

61.     Boyce himself is personally liable for Stokes's termination.

62.     Ordinarily the law protects one acting in his official capacity from personal liability for an official act.  But that changes where the law clearly establishes the constitutional right in question.  In such instances, the official should have known better.

63.     Boyce should have known better. "Terminating an employee for engaging in protected speech … is an objectively unreasonable violation of such an employee's First Amendment rights."  Charles v. Grief, 522 F.3d 508, 511 (5th Cir. 2008).

64.     Boyce did know better but apparently decided violating the First Amendment was worth it, presumably to avoid controversy, not even necessarily for the University, but for himself.  Discovery likely will show that Boyce defends controversial speech when he perceives it to be politically beneficial to him but condemns it when he does not.

65.     In either event, controversy is no justification for violating the First Amendment and no one, certainly not Mr. Kirk, would want to live in world where universities are free of controversial speech.  "A university that turns itself into an asylum from controversy has ceased to be a university; it has just become an asylum."  Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1129–30 (11th Cir. 2022) (concurring opinion).

Post-termination

66.     The University's punishment of Lauren for having a point of view did not end there, however.

67.     Boyce's press release, which condemned Lauren but omitted her apology, was immediately widely reported by state media.

68.     Lauren and John and their restaurant received harassing phone calls and emails, including death threats and bomb threats, nonstop for days.  The following voice messages are merely indicative:

> [S]omebody who is fucking crazy is going to come after that fucking cunt …
> You guys better be careful ... I hope YOU and your employees are safe I
> swear I really do. Because SOMEBODY is going, if I am this pissed and I'm
> not going to do anything, somebody who is is going to go fucking bananas.
> You guys be fucking careful. Seriously. No need for anybody else innocent
> to die, you fucking suck, get rid of that fucking cunt. Get her OUT of your
> fucking restaurant. Never fucking ever.
>
> * * *
>
> Hi I'd like for Lauren Stokes to get shot in the fucking head so we can all
> laugh at that dumb cunt, peace, zero stars, you're getting blown up
> ahahahahahaaa.
>
> * * *
>
> Lauren, you're not gonna have your restaurant much longer, you're targeted
> and you're no longer worthy in this world.
>
> * * *
>
> Fuck you fuck your place, I'll fucking burn the place down with you guys in it.
> You motherfuckers. Fuck the boss there she is a fucking piece of shit.

69.     Lauren left town for her safety.  The restaurant was fully closed for two weeks.

70.     The events were, understandably, devastating to Lauren.

71.     During this sensitive time Lauren consulted a therapist.  The therapist is employed by the University's counseling center but has a private practice.  Lauren consulted her as a private client.

72.     The therapist was supportive of Lauren and deeply concerned for her wellbeing.  She insisted on seeing Lauren twice a week until things subsided.

73.     But, abruptly, on September 19, 2025, the therapist advised that she could no longer see Lauren.  She stated that she had been told that she had a conflict of interest that prevented her from seeing Lauren.

74.     Discovery likely will show that, incredibly, the University instructed the therapist to dump Lauren.

75.     Any discussion of Lauren between the therapist and the University is a gross violation of Lauren's privacy and HIPPA.  It is furthermore outrageous that the University would interfere in a private therapist-patient relationship under any circumstances, but especially here, where the University had already caused Lauren such suffering.

76.     John and Lauren's restaurant is reopened today, but unfortunately now requires security, which is expensive.

77.     Typically, this time of year it would be feeding University groups including various Ole Miss sports team.  The University cancelled standing orders for home football games.  Discovery likely will show that Boyce instructed the University's constituencies not to place catering orders from the restaurant.

78.     The University and Boyce have acted unlawfully and, worse, maliciously.

79.    These acts are no way to treat a member of the shared Ole Miss community who has so meaningfully contributed to it over the years.

80.    As a result of these acts, Lauren has suffered extreme emotional and financial damages, for which Boyce and the University are liable.

## CAUSE OF ACTION

### Violation of the First Amendment

81.    Glenn Boyce and the University, through him, committed the wrongful acts described in this complaint in retaliation for Lauren Stokes's speech and views, in violation of the First Amendment.

———————————————

WHEREFORE, Lauren Stokes respectfully requests that, after due proceedings, including a trial by jury, the Court enter judgments:

1.    declaring that Glenn Boyce, in his official and personal capacities, violated her First Amendment rights;

2.    ordering him to pay her all compensatory and punitive damages she is due;

3.    ordering him to pay her costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.    awarding any and all other relief as may be just and equitable.

October 21, 2025

Respectfully submitted,

Lauren Stokes



Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

for Lauren Stokes