**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**LAUREN STOKES,**                                                 **PLAINTIFF**

**v.**                                               **Case No.: 3:25-cv-307-GHD-RP**

**GLENN BOYCE, CHANCELLOR OF
THE UNIVERSITY OF MISSISSIPPI,
In his official and personal capacities,**                         **DEFENDANT**

**DEFENDANT'S BRIEF IN SUPPORT OF HIS RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Lauren Stokes, then an employee of the University of Mississippi, reposted a statement about Charlie Kirk on her personal Instagram page on September 10, 2025. That night, after the post had generated a huge negative reaction, Plaintiff recognized it could negatively impact her, the University, and her supervisor. That fear proved well-founded the next morning. The public backlash from her social media post disrupted Plaintiff's job performance and seriously hampered her department's operations. The University faced widespread reputational harm among its various constituents and reallocated many resources to ensure campus safety and address the deluge of telephone calls, emails, and texts from across the country. To stem the disruption to ongoing operations, the University first requested Plaintiff's resignation and then terminated her employment. Plaintiff has sued the University's Chancellor, alleging violation of her First Amendment rights. Almost two months after her termination and two weeks after filing her Complaint, Plaintiff first requested reinstatement to her former position (which the University has already filled), claiming that "[t]here was no opportunity for the off-campus speech to disrupt the University's actual on-campus Operations" before her termination. The facts show otherwise, and this Court should deny Plaintiff's Motion.

## FACTS

The University employed Plaintiff as the Executive Assistant to Charlotte Parks, the Vice Chancellor for Development. Plaintiff's job responsibilities included organizing staff meetings, setting up travel and appointments, answering telephone calls, and performing other administrative tasks. Because the Development Office, and the Vice Chancellor in particular, had frequent contacts with University donors, Plaintiff's responsibilities included contact with donors and potential donors when necessary. Ex. "A" (Parks Decl.).

After the death of podcaster Charlie Kirk on September 10, 2025, Plaintiff reposted an image on her personal Instagram account:



For decades, yt supremacist and reimagined Klan members like Kirk have wreaked havoc on our communities, condemning children and the populace at large to mass death for the sake of keeping their automatic guns. They have willingly advocated to condemn children and adult survivors of SA to forced pregnancy and childbirth. They have smiled while stating the reasons people who can birth children shouldn't be allowed life-saving medical care when miscarrying. They have incited and clapped for the brutalizing of Black and Brown bodies. So no, I have no prayers to offer Kirk or respectable statements against violence.

@thecollectress

Kirk had planned to speak at the University on October 29, 2025, at an event hosted by Turning Point USA at Ole Miss (a registered student organization) and the Declaration of Independence Center for the Study of American Freedom. *See Charlie Kirk: The American Comeback Tour*,

2

https://eventcalendar.olemiss.edu/event/charlie-kirk-hosted-by-the-tpusa-chapter-at-university-of-mississippi-ole-miss-the-american-comeback-tour (last accessed Dec. 1, 2025).

Plaintiff's post quickly gained notoriety online after it was posted to another forum with more than 80,000 followers. Ex. "A" (Parks Decl.). Plaintiff recognized the immediate negative reaction to her post. She removed it the same evening, explaining that her earlier post was made "in a heated moment" and "I apologize to those I have offended and look forward to getting off the internet to reevaluate kindness, privacy, and respect for all." Am. Compl., at ¶ 16 [Doc. 3]. Plaintiff and her husband received numerous negative messages that night about the original post, which had been screenshotted and shared widely online. Ex. "A" (Parks Decl.).

Lisa Stone, the University's Vice Chancellor for Marketing and Communications, became aware of Plaintiff's original post on the evening of September 10. Stone's team noticed that Plaintiff's post was receiving a large amount of attention on social media and that many people discussing the post interpreted it as condoning violence against Kirk or others. Stone told Parks, Plaintiff's supervisor, about Plaintiff's post that same night because she thought the controversy would impact the Development Office. Stone also called William Kneip, the Chief of Staff to Chancellor Glenn Boyce, to inform him about the post. Ex. "B" (Stone Decl.).

Parks contacted Plaintiff after 10:00 p.m. on September 10 to check on her well-being. Plaintiff told Parks that she had posted "something very reactive and intense and unkind and political" on her Instagram page which had caused a widespread negative reaction. She also feared that her post could impact Parks and the University: "I don't want anything to come down on development or you and I am SO SORRY if that has happened at all!" Ex. "A" (Parks Decl.).

Plaintiff emailed Parks again later that night:

Please forgive my late email - I got doxxed and there's a million posts going around, along with all sorts of cruelty. I am terrified this will affect Development or god

forbid – you – in some way. I have deactivated Tarasque Facebook account and my personal account is set to private, as is Instagram. But, as I now know, nothing is private. I'm so sorry to bug you but thinking I should go to HR first thing tomorrow just in case to see what procedures are best or could be helpful in this case? Any suggestions are welcomed for best practices or protocol to keep everything and everyone safe and protected!

*Id*.

Plaintiff's Instagram post was quickly associated with her employment with the University. By the morning of September 11, the University was receiving a large volume of emails, text messages, and social media posts and direct messages criticizing Plaintiff's post and demanding action from the University. Stone's team decided to pause the University's social media remembrance about the terrorist attack that occurred on September 11, 2001, (which had been scheduled to be posted at 7:00 a.m. on September 11) out of concern that the post would be disrupted by responses to Plaintiff's post about Mr. Kirk. Ex "B" (Stone Decl.). Around 6:30 a.m. on September 11, Stone contacted Kirk Purdom, the CEO of Alumni Affairs, and advised him to limit his office's social media posts for the same reason.

On September 11, 2025, Stone's team devoted considerable resources to assisting other University departments with their responses to these communications. *Id*. The Marketing and Communications team noted that individuals were sending direct messages about Plaintiff to the University's social media account, a key data point used to measure the significance of an issue. By monitoring the origin of the comments, Ms. Stone's team determined that the comments on social media represented a wide geographic area including strong engagement in Texas, California, Florida, Illinois, and New York – several states which are among the University's priority recruitment markets for out-of-state student enrollment. The University's overall enrollment is more than 50 percent non-resident students, and it relies on out-of-state tuition to fund the University. *Id*.

4

To assist the Development Office, Stone's team also monitored the volume of angry and threatening messages left on Plaintiff's University voicemail. Through the afternoon of September 11, that mailbox had exceeded 400 voicemails, a volume too large to manage. *Id*. Employees in the Development office told Parks they feared for their safety, so Parks met with the University's Chief of Police, who agreed to have UPD officers patrol the area around the Development Office. Ex. "A" (Parks Decl.). The Development Office runs a "phone-a-thon" each fall, during which student callers contact potential donors to ask for financial support. The Development Office canceled the "phone-a-thon" for the day before 7:00 a.m. so student volunteers would not face backlash during their calls and did not resume the "phone-a-thon" for the rest of the week. *Id*. Stone also learned that Alumni Affairs was also inundated with angry calls. Ex. "B" (Stone Decl.).

Parks and Stone communicated these developments to Chancellor Glenn Boyce throughout the morning of September 11. Ex "A" (Parks Decl.); Ex. "B" (Stone Decl.); Ex. "C" (Boyce Decl.). The Chancellor's Chief of Staff, William Kneip, also told the Chancellor that he and other University officials were receiving external pressure from donors and public officials to take some action. The Chancellor knew that, as Parks' Executive Assistant, Plaintiff occupied a position visible to the University's donors. *Id*.

By 9:00 a.m. on September 11, 2025, the University placed Plaintiff on administrative leave with pay in an effort to protect her. Ex. "D" (Administrative Leave Letter). But the disruption to the University continued. Around 10:15 a.m. on September 11, the Chancellor decided the University needed complete separation from Plaintiff to resolve the disruption to the University's operations and the potential harm to its reputation. The Chancellor decided Ms. Parks needed to seek Ms. Plaintiff's resignation and, if she would not voluntarily resign, to

terminate her employment. Ex. "C" (Boyce Decl.). After Plaintiff did not voluntarily resign, Parks notified her of the termination around 12:50 p.m. *Id*. Parks explained that Plaintiff was being terminated because of the disruptive impact her post was having on the University. Ex. "A" (Parks Decl.); *see also* Ex. "E" (Termination Letter).

The Chancellor made the decision that the University had to separate from Plaintiff based on the disruption Plaintiff's post caused the University and the adverse impact he expected to the reputation and financial well-being of the University absent Plaintiff's separation. Ex. "C" (Boyce Decl.). The Chancellor believed the circumstances required quick action. *Id*. The Chancellor would not have instructed Parks to ask for Plaintiff's resignation or to terminate her employment if Plaintiff's Instagram post had not gone viral and created a disruption to the operations of the University. *Id*. The Chancellor did not terminate Plaintiff's employment based on his personal opinion about the viewpoint expressed in her Instagram post. Rather, he based his decision on the actual and foreseeable disruption to the University's operations and reputational harm to the University among stakeholders and members of the public. *Id*.

Shortly after Plaintiff was terminated, the Marketing and Communications team published a message from Chancellor Boyce on social media announcing that the University no longer employed the staff member who had posted about Charlie Kirk (though the statement did not mention Plaintiff by name, in a continued effort to protect her). Ex "B" (Stone Decl.). The interest in Plaintiff's post about Mr. Kirk had gone so viral that the Chancellor's message had over 1.3 million views on Facebook and X. Almost immediately after the University published the message, the negative comment and threats of disruption on social media stopped. *Id*.

A search for Plaintiff's replacement has already concluded. The University posted the open position around October 1, 2025, and Vice Chancellor Parks extended an employment offer

to the successful candidate on October 27. The new hire started on November 10, 2025. Ex. "A" (Parks Decl.).

STANDARD

A court should only grant a preliminary injunction where the plaintiff clearly demonstrates: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the preliminary injunction is not granted, (3) the threatened harm to the plaintiff outweighs the harm the preliminary injunction may do to the defendant, and (4) granting the preliminary injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). A preliminary injunction is an "extraordinary and drastic remedy that should only be granted when the movant has clearly carried the burden of persuasion." *Id*. (*citing Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). *See also Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985) ("The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.").

The standard for granting mandatory injunctive relief, like the reinstatement Plaintiff's Motion seeks, is even higher. *See Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the *status quo pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

ARGUMENT

**1.      *The Court should decide the pending Motion to Dismiss before considering Plaintiff's motion for injunctive relief.***

The Chancellor has filed a Motion to Dismiss asserting Eleventh Amendment immunity and qualified immunity. [Doc. 15]. Both defenses provide immunity from the burdens of suit

rather than mere liability. *See Melton v. Phillips*, 875 F.3d 256, 265 n. 9 (5th Cir. 2017) ("It is important to consider [qualified immunity] at the earliest possible stage of litigation because qualified immunity is an immunity from suit that is effectively lost if a case is erroneously permitted to go to trial.") (internal quotation omitted); *McCarthy v. Hawkins*, 301 F.3d 407, 415 (5th Cir. 2004) (noting that Eleventh Amendment "confers an immunity from suit") (internal citation omitted).

Courts have recognized that, even absent such considerations regarding the priority of immunity defenses, considering a motion to dismiss before a motion for preliminary injunction promotes judicial economy and allows for a more orderly and careful determination of the issues. *See Pham v. Univ. of La. at Monroe*, 194 F. Supp. 3d 534, 549 n. 8 (W.D. La. 2016), *aff'd Pham v. Blaylock*, 2017 U.S. App. LEXIS 20275, *11 (5th Cir. Oct. 17, 2017) (noting that grant of dismissal based on qualified immunity required court to disregard evidence adduced at hearing on preliminary injunction); *Arruda & Beaudoin, LLP v. Astrue*, 2011 U.S. Dist. LEXIS 113022, *2 (D. Mass. Sept. 30, 2011) (noting that issues raised in motion to dismiss will necessarily need to be resolved as part of preliminary injunction motion and that deciding motion to dismiss first will advance orderly determination of issues); *Labat-Anderson, Inc. v. United States, 346 F. Supp. 2d 145*, (D.D.C. 2004) ("when presented with a motion for a preliminary injunction and a competing motion to dismiss for lack of jurisdiction, the Court must address the jurisdictional issues first, and may reach the merits of the motion for preliminary injunction only once, and only if, jurisdiction is established."); *Penn. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 101 (D.D.C. 2003) ("Plaintiff's preliminary injunction motion does not take priority over defendants' motion to dismiss for lack of jurisdiction.").

The Court should hold Plaintiff's Motion for Preliminary Injunction in abeyance pending a ruling on the Chancellor's Motion to Dismiss.

**2.     *Plaintiff cannot succeed on the merits.***

**a.     *Plaintiff's Instagram post disrupted University operations.***

The Court should deny Plaintiff's request for preliminary injunctive relief because she has failed to establish that she is likely to succeed on the merits of a First Amendment retaliation claim against the Chancellor. A government employee's First Amendment claim has five elements. First, there is the threshold question of whether the employee spoke as a citizen or pursuant to her official duties. *Wetherbe v. Tex. Tech. Univ. Sys.*, 138 F.4th 296, 303 (5th Cir. 2025) (*citing Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Official-duty speech is not protected by the First Amendment. *Id*. A government employee alleging retaliation because of private-citizen speech must also prove (1) she suffered an adverse employment decision; (2) her speech involved a matter of public concern; (3) her interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct. *Id*. (*citing Hurst v. Lee County*, 764 F.3d 480, 484 (5th Cir. 2014)). Plaintiff is not likely to succeed on the merits of this lawsuit because she has offered no proof that her interest in speaking outweighed the University's interest in promoting efficiency in the workplace.[1]

The question of whether a government employee's interest in speaking outweighs her employer's interests in maintaining discipline and efficiency in the workplace involves a case-specific balancing of those interests. *See Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020); *Gunaca v. Texas*, 65 F.3d 467, 474

---

[1] The Chancellor reserves the right to dispute any of these elements at an appropriate stage but focuses this Response on the *Pickering* balancing of interests.

(5th Cir. 1995). In determining whether Plaintiff's speech outweighs the University's interest in the efficient provision of public services, the Court should consider "whether the speech was likely to generate controversy and disruption, impede[] the [] general performance and operation, and affect[] working relationships necessary to the department's proper functioning." *Johnson v. Miller*, 126 F.4th 1020, 1030 (5th Cir. 2025) (*citing Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 223 (5th Cir. 1999)); *see also Bevill v. Wheeler*, 103 F.4th 363, 378 (5th Cir. 2024) (noting courts may consider whether employee's speech "impedes the performance of the speaker's duties") (*citing Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

Plaintiff's Motion asks the Court to assume, based on no proof, that her Instagram post could not have disrupted the University's operations and that the Chancellor sought to punish her for her viewpoint. She provides no proof for either contention.

First, Plaintiff is incorrect that "the law requires [the University] to show the speech disrupted its actual operations." Pl.'s Brf., at 10 [Doc. 7]. To the contrary, "it is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 741 (5th Cir. 2015) (*citing Connick v. Myers*, 461 U.S. 138, 152 (1983)). Rather, "courts have consistently given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Id.* (*citing Nixon v. City of Houston*, 511 F.3d 494, 499 n.8 (5th Cir. 2007)).

Here, contrary to Plaintiff's unsupported assertion that "[t]here was no opportunity for the off-campus speech to disrupt the University's actual on-campus operations," Am. Compl., at ¶ 47 [Doc. 3], undisputed evidence demonstrates that the fallout from Plaintiff's Instagram post *did* disrupt the University's operations. Plaintiff acknowledged to her supervisor that such

10

disruption was likely, and she was unable to perform her work duties as a result. Plaintiff's department canceled a fundraising event and sought police protection around its offices. The University diverted time and resources to address the volume of calls, emails, and messages it received protesting Plaintiff's post.

This is not a case in which the Chancellor sought to avoid "discomfort" or "inconvenience" within the workplace – this is a case in which Plaintiff's post was causing an actual disruption and the Chancellor concluded (as had Plaintiff in her messages to Parks) that it was likely to cause an ongoing disruption if he did not act quickly. Nor is this a case in which Plaintiff's speech was of such import as to outweigh the University's interests. As the Chancellor has noted in his Motion to Dismiss, the Instagram post did not contain allegations of corruption or misbehavior by public officials, which the Fifth Circuit has held outweigh the government's interest in efficiency. *See Bevill v. Wheeler*, 103 F.4th 363, 378 (5th Cir. 2024); *Breaux v. City of Garland*, 205 F.3d 150, 157 n.10 (5th Cir. 2000). Nor is this a case where Plaintiff's reposted comments were merely part of a "private conversation with another employee." *Rankin v. McPherson*, 483 U.S. 378, 389 (1987) – this was a viral post attracting attention across the country.

Plaintiff cites a pair of Tenth Circuit cases she claims support her theory that the Chancellor's decision was a "rush to judgment based on perceived public reaction" to her speech. However, she ignores the context of the *Pickering* balancing discussed in those cases. *See Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1253 (10th Cir. 2024) (finding employee's interests prevailed in *Pickering* balance where he "spoke on matters of serious concern to the taxpaying public—school funding, cronyism, educational choice, and discrimination"); *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) ("The record is devoid of evidence of actual, or

11

potential, disruption of the department's internal operations -- no discipline problems, no disharmony, no impact on close working relationships, and no performance problems by plaintiffs.").

On the other hand, the Fifth Circuit has held that disruption far less than was caused by Plaintiff's Instagram post justified termination of a public employee. For example, it recently held that the termination of a government employee for a controversial social media post did not violate clearly established law because it could disrupt the work environment and reflect poorly on the public image of her employer. *See McLin v. Twenty-First Judicial District*, 79 F.4th 411, 414 (5th Cir. 2023). In that case, where the employee's post apparently expressed approval of a motorist who drove a vehicle through a crowd at a rally protesting George Floyd's murder, the court dismissed the plaintiff's First Amendment retaliation claim even though there was no indication that the plaintiff's Facebook post caused any meaningful public outcry or impeded the plaintiff's ability to perform her job duties. *See also Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 741 (5th Cir. 2015) (holding that police department did not violate employee's First Amendment rights where Facebook comments critical of leadership led to prediction of disruption due to "buzz around the department" and "change in the demeanor" of some employees).

Plaintiff also points to two other cases in which courts have granted injunctive relief to employees who posted on social media about Kirk's death. Pl.'s Brf., at 12 [Doc. 7]. Again, though, she bases these arguments on the assumption that her post did not disrupt the University's operations. In another recent case discussing the same issue, a district court denied injunctive relief because the agency had provided undisputed proof of operational disruption. *See Brown v. Young*, No. 4:25cv419-MW/MJF, 2025 U.S. Dist. LEXIS 223127, at *9 (N.D. Fla.

12

Nov. 13, 2025) (denying injunctive relief where state employee's Instagram post about Kirk "disrupted agency operations, required diversion of staff resources to manage responses, and raised legitimate concerns about the agency's credibility and public trust").

Plaintiff has made no attempt to provide any proof that her interests outweigh the University's interests under these circumstances. She is unlikely to prevail on the merits of her First Amendment claim, and her Motion should be denied.

> b.    *A viewpoint discrimination analysis is inappropriate.*

Plaintiff also argues that a preliminary injunction is appropriate because the University cannot have "different rules for different viewpoints." Pl.'s Brf., at 13 [Doc. 7]. First, Plaintiff cites no authority indicating that a viewpoint discrimination analysis, which typically calls for strict scrutiny, should apply to her First Amendment employment retaliation claim rather than the *Pickering* balancing test. There appears to be no such Supreme Court or Fifth Circuit authority, and district courts recently considering the issue have rejected the application of strict scrutiny. *See Fox v. City of Austin*, No. 1:22-cv-00835-DAE, 2024 U.S. Dist. LEXIS 159628, at *7 (W.D. Tex. Sep. 4, 2024) (applying *Pickering* balancing where "Plaintiff fail[ed] to provide a case applying strict scrutiny when the government acts as an employer"); *Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 U.S. Dist. LEXIS 43617, at *32 (E.D. Tex. Mar. 11, 2022) (gathering cases in which "other district courts and courts of appeals have indicated that *Pickering* applies to viewpoint-discrimination claims brought by public employees").

Plaintiff's Motion also fails to offer any proof that the Chancellor's decision "target[ed] not merely a subject matter, 'but particular views taken by speakers on a subject.'" *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (*citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515

U. S. 819, 829 (1995)). Plaintiff theorizes that discovery will show that "[t]he University routinely discriminates against viewpoints when it deals with controversial speech by defending the speaker's right to speak when it perceives the viewpoint to be politically favored and condemning the speech as "unacceptable" when it perceives it is not." Pl.'s Brf., at 13 n.3 [Doc. 7]. However, she offers no such proof to support her Motion. To the contrary, Chancellor Boyce has offered evidence that he has never terminated any other employee based on social media post. Ex. "C" (Boyce Decl.).

### 3. *Plaintiff has not demonstrated irreparable harm.*

Plaintiff has offered no proof that she has suffered irreparable harm sufficient to justify mandatory injunctive relief. Plaintiff correctly notes that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" when "First Amendment interests were either threatened or in fact being impaired *at the time relief was sought*." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (discussing injunctive relief for employees were threatened with termination but had not yet been terminated, and those who had changed their behavior to avoid discharge) (emphasis added). However, the Fifth Circuit has also recognized that an "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 227-28 (5th Cir. 2016); *see also Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir. 2020) (holding that "the Supreme Court limits the *Ex Parte Young* exception to 'cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past'"). Plaintiff's First Amendment claim arises from the termination of her employment, which has already occurred and does not threaten to chill her speech prospectively. *See Smith v. Okolona Mun. Separate Sch.*

14

*Dist.*, No. 1:97cv226-D-A, 1997 U.S. Dist. LEXIS 13518, at *4-5 (N.D. Miss. July 31, 1997) (denying preliminary injunction reinstating First Amendment plaintiff to prior job because "mere loss of income and reputation is an insufficient ground upon which to base irreparable harm") (*citing Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Plaintiff has offered no proof that her separation from the University has caused irreparable harm. This Court should deny her Motion.

**4. *Plaintiff's delay in seeking relief weighs against a mandatory injunction.***

Finally, the balance of equities does not favor a mandatory injunction in this case. Plaintiff did not appeal her termination to HR as she was informed she could in her termination letter. Ex. "E" (Termination Letter). Nor did Plaintiff seek a temporary restraining order. Instead, she waited until November 7, 2025, to file this motion and – nearly two months after her termination on September 11 – seeking to be reinstated. By that time, the University had already hired someone else to fill the position. Ex. "A" (Parks Decl.). *See Sanders v. Fitch*, No. 1:23CV105-MPM-RP, 2023 U.S. Dist. LEXIS 204535, at *1 (N.D. Miss. Nov. 15, 2023) ("The purpose of a preliminary injunction is to preserve the status quo during the course of litigation until the court can hold a trial on the matter."). This Court should deny Plaintiff's request for the Court to alter the status quo during the pendency of this matter, which would require displacing a recently hired employee, particularly where she is also seeking damages for the same claims.

## CONCLUSION

Plaintiff's post caused actual disruption to the University's operations and the University had good reason to believe that disruption would continue if Plaintiff remained employed. Accordingly, Plaintiff has failed to show she is likely to succeed on the merits of her claim. Plaintiff has also failed to show that she would be irreparably harmed if not reinstated, and the equities in reinstating Plaintiff to her position after the University has already hired a

replacement do not weigh in Plaintiff's favor. The Court should deny her request for a mandatory preliminary injunction. The Chancellor requests such other relief as the Court deems appropriate under the circumstances.

This, the 10th day of December 2025.

Respectfully submitted,

**GLENN BOYCE, CHANCELLOR OF THE UNIVERSITY OF MISSISSIPPI, in his official and personal capacities**

*s/J. Cal Mayo, Jr.*
J. CAL MAYO, JR. (MB NO. 8492)
PAUL B. WATKINS, JR. (MB NO. 102348)
*Attorneys for Defendant*

OF COUNSEL:

MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Tel: (662) 236-0055 | Fax: (662) 236-0035
*cmayo@mayomallette.com*
*pwatkins@mayomallette.com*