UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| LAUREN STOKES,<br><br>    Plaintiff,<br><br>    v.<br><br>GLENN BOYCE, CHANCELLOR OF THE UNIVERSITY OF MISSISSIPPI, in his official and personal capacities,<br><br>    Defendants. | Case No. 3:25-cv-307-GHD-RP<br><br>District Judge Glen H. Davidson<br><br>Magistrate Judge Roy Percy |

RESPONSE TO MOTION TO DISMISS

Lauren Stokes respectfully opposes Glenn Boyce's motion to dismiss [16].

RESPONSE INTRODUCTION

Boyce's motion argues Lauren has not alleged a "plausible" First Amendment claim and he is entitled to both qualified immunity and Eleventh Amendment immunity.

Lauren's pending motion for preliminary injunctive relief already addressed many of Boyce's motion's arguments. To the extent necessary, she addresses them again here. To the extent Boyce's response to her motion for preliminary injunctive relief asserts relevant facts which she does not dispute, she relies on them here, too.

Below Lauren shows: 1. Unquestionably, she has alleged a "plausible" First Amendment claim. 2. Boyce is not entitled to qualified immunity. 3. The Eleventh Amendment is no obstacle to this case. 4. There is no reason to decide this motion out of order.

RESPONSE ARGUMENT

1. Unquestionably, Lauren has alleged a "plausible" First Amendment claim.

Lauren's amended complaint tells the story of her termination. [3] Boyce does not dispute that he terminated her, or that he did it because of something she reposted on Instagram. He does not dispute that the repost constitutes private speech on a matter of public concern. [16 at p. 6] Instead he argues Lauren's First Amendment claim is not "plausible" because his interest in terminating her outweighs her interest in speaking.

Lauren's briefs in support of her motion for preliminary injunctive relief, to the extent they show she is likely to succeed on the merits, already address the "plausibility" of her claim. [7, 21] Boyce's termination of her was viewpoint-based, therefore her First Amendment interest is high, and Boyce's burden to justify terminating her is heavy. Based on his submissions, Boyce cannot point to the kind of disruption that would justify terminating Lauren.

a. Boyce's decision was viewpoint-based.

The facts, inasmuch as Lauren alleges viewpoint discrimination, are straightforward.

The Court, in deciding a motion to dismiss, necessarily accepts the alleged facts as true, but in any event the following facts are undisputed: Charlie Kirk was controversial. [3 at ¶13] When he was shot, the country reacted. [3 at ¶14] Some mourned him; some did not. In the middle of a robust public debate, Lauren privately reposted something someone else wrote explaining reasons they did not mourn Kirk. [3 at ¶15] Boyce's press release announcing her termination expressly condemned that point of view. [3 at ¶26]

Days later Boyce hosted Kirk's wife and Vice President JD Vance at a highly publicized Turning Point USA event. [16 at p. 2] After, Boyce gushed about the national attention: "I just think that the trajectory of this university and the national visibility this university has gotten over

the last five-to-six years in particular (is why Vance and Kirk spoke at UM). ... I think as much as anything, we are now truly, truly on a national map in many, many ways."[1]

Boyce's press release and subsequent statement communicated: If you work for the University, mourn Kirk or shut up. Turning Point USA events are the kinds of events that Boyce wants the University to be known for.

This is not to say Boyce's, or any other Kirk mourner's, opinion is wrong—but instead to make the obvious point that Boyce did something the First Amendment abhors when he terminated Lauren: He cancelled one side of a public debate.

Boyce's motion to dismiss does not address Lauren's allegation that his termination of her was viewpoint-based. But when, in his response to Lauren's motion for preliminary injunctive relief, he told the Court that it cannot apply "strict scrutiny," he suggested that viewpoint discrimination is permissible in the employment context. [18 at p. 13] That is not true. The *Pickering* test is a balancing test. Courts applying *Pickering* necessarily account for viewpoint discrimination all the time. Lauren already cited, in both her complaint and her memorandum in support of her motion for preliminary injunctive relief, three recent opinions in which federal courts of appeals held public employers could not terminate an employee solely on the basis of his views. [3 at ¶55, 21 at p. 6] *See Fenico v. City of Philadelphia*, 70 F.4th 151 (3d Cir. 2023) (a police department in Philadelphia could not discipline police officers whose social media posts openly denigrated minority groups solely on the basis of their views); *Brown v. City of Tulsa*, 124 F.4th 1251 (10th Cir. 2025) (a police department in Tulsa could not terminate an officer whose social media posts were racially inflammatory solely on the basis of his views); *Jorjani v. New*

---

[1] "Why Ole Miss? Guest speakers make exclusive UM stop," *Daily Mississippi*, Oct. 30, 2025, available at https://thedmonline.com/why-ole-miss-guest-speakers-make-exclusive-um-stop/. See also 21-6.

*Jersey Inst. of Tech.*, 151 F.4th 135, 144 (3d Cir. 2025) (a public university in New Jersey could not terminate a lecturer whose private speech glorified Hitler solely on the basis of his views: "NJIT posits that because Jorjani offered views it disliked, the First Amendment should not apply, and it is entitled to summary judgment. We cannot agree, lest we permit 'universities to discipline professors, students, and staff any time their speech might cause offense.'"). Boyce fails entirely to address these cases, and the two cases he cited in support of his own argument do not stand for the proposition that viewpoint discrimination is permissible in the employment context. They stand for the opposite. *See Hiers v. Bd. of Regents of the Univ. of N. Texas Sys.*, No. 4:20-cv-321-SDJ, 2022 WL 748502, at *12 (E.D. Tex. Mar. 11, 2022) ("[E]ven if *Pickering* applies rather than some higher form of scrutiny, the facts alleged support a plausible conclusion that the university officials engaged in unconstitutional viewpoint discrimination when they discontinued Hiers's employment."); *Fox v. City of Austin*, No. 1:22-cv-00835 (W.D. Tex. Sept. 4, 2024) (declining to apply strict scrutiny but nevertheless denying employer's motion for summary judgment).

  In his response to Lauren's motion for preliminary injunctive relief, Boyce contended there is no proof to support the allegation that he discriminates against viewpoints, because "[he] has offered evidence that he has never terminated any other employee based on [a] social media post." [18 at p. 14] But the fact that Boyce has never terminated an employee for a social media post, if true, does not at all negate the possibility that he has discriminated against viewpoints[2] and did so here. It is the content of the speech, not its medium, that matters.

---

[2] As just one example, the University fired a history professor who had criticized "powerful racist donors." A news story on the firing reported "increasing levels of paranoia on campus" and linked it to Boyce's "controversial appointment." "UM Fires History Professor Who Criticizes 'Powerful, Racist Donors' and 'Carceral State'," *Mississippi Free Press*, Dec. 15, 2020, available at www.mississippifreepress.org/um-fires-history-professor-who-criticizes-powerful-racist-donors-and-carceral-state/.

Boyce has no argument his termination of Lauren was not viewpoint-based. Because it was viewpoint-based, the First Amendment interest is high, and Boyce's burden to justify terminating Lauren is heavy.

    b. Boyce cannot point to the kind of disruption that would justify terminating Lauren.

Boyce contends "[he] made the best decision under dire circumstances" [16 at p. 3] but his submissions confirm that any alleged disruption to the University was external, fleeting, and largely online only, and Lauren did not cause the disruption, her doxers did.

Based on Boyce's submissions, there are, apparently, important areas of which there can be no factual disagreement:

    i. Lauren was an administrative assistant.

Lauren's tasks were administrative only. [3 at ¶11] She did not have policymaking authority. She did not have the kind of job that gives an employer greater power to restrict an employee's speech.

    ii. Lauren's repost was after work, on a private account, and did not pertain to the University.

On Wednesday, September 10, after work, Lauren reposted something someone else wrote on her private Instagram account. [3 at ¶15]

Boyce represents that Lauren "reposted controversial statements . . . to a public or semi-public audience" [16 at p. 8] but offers no support for the representation. Lauren's complaint alleges her Instagram account was private, and the Court must accept that allegation as true. The evidence will show that only persons with access (family and friends) could see the account. The

account's posts were not intended for the public. The public could not see the account. Neither the account nor its posts pertained to the University or anyone at the University.

The repost also "reflected positions that represent 'by no means an isolated segment of public opinion.'" *MacRae v. Mattos*, 606 U.S. ----, 145 S. Ct. 2617, 2620 (2025) (Thomas, J., joining but writing separately respecting the denial of certiorari) (citation omitted).

      iii.    Lauren was doxed.

The same night, immediately after learning that the repost had offended someone who saw it, Lauren deleted the repost and posted an apology. [3 at ¶16]

But it was too late; she was already being doxed.[3] [18 at p. 3] Someone had taken a screenshot of the private post and shared it with someone else. Eventually, someone else shared it publicly online. Once it was shared publicly online, it went viral. An angry social media mob trolled[4] Lauren and called for retribution. [3 at ¶19] Her personal information, including her work and restaurant phone numbers, was posted and shared to encourage people to harass and shame her, which they did. Lauren and her husband received threats of violence to themselves and their restaurant.

      iv.    Lauren feared for herself and the persons close to her.

Late that night, Lauren spoke with Charlotte Parks, her boss, and, instinctively, apologized. [18 at p. 3] In his response to Lauren's motion for preliminary injunctive relief, Boyce portrayed the apology as an admission of fault. But the evidence will show that Parks apologized to Lauren

---

[3] Webster's defines "dox" as: "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." Dox, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox (last visited on December 16, 2025).

[4] Webster's defines "troll" as: "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content." Troll, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox (last visited on December 16, 2025).

first. Parks wrote Lauren: "Lisa Stone just called me and said you are getting attacked on-line. I am so sorry." Lauren thanked Parks for checking on her and apologized for the impact on Parks. Parks responded: "Gracious no! I am just worried about you. I hope people are more rational in the morning. These are crazy times."

On Thursday morning, September 11, Parks and Lauren exchanged texts about work, and Lauren told Parks that she would go to HR first thing. Meanwhile, Lauren promptly responded to Parks's inquiries about work. Later, while Lauren was at HR, Lauren told Parks: "I'm in HR and we are [waiting] on someone to arrive. . . . I am so so so sorry and hope you are okay. I would never intentionally do anything to create more work for you or cause stress at any time." Even after leaving HR and campus, Lauren continued to communicate with Parks about work.

    v.  The University put Lauren on administrative leave at 9 a.m. to protect her.

Every person who observed or checked on Lauren that morning could see that she was a victim of a modern-day public stoning. She and they were worried for her safety. People were calling Lauren's work phone and leaving "angry and threatening messages." [18 at p. 5] At approximately 9 a.m., the University put her on paid administrative leave "in [her] best interest." [3 at ¶20, 21-1]

    vi.  At 10:15 a.m., Boyce decided to publicly fire her.

At 10:15 a.m., Boyce apparently decided he wanted "complete separation." [18 at p. 5]

Boyce does not point to anything that changed between 9 a.m. and 10:15 a.m. which would now justify a termination. He has previously said only: "the disruption to the University continued." [18 at p. 5] But Lauren herself did not cause the disruption; her doxers did. Lauren did not aggravate the situation between 9 a.m. and 10:15 a.m. Lauren was off-campus, worried for her safety, making plans with her husband to secure their restaurant.

      vii.    The only disruption was external.

By Boyce's own account, the only disruption to the University was external. He has said it received "a large volume of emails, text messages, and social media posts" about Lauren, which appeared to come from a "wide geographic area" including "Texas, California, Florida, Illinois, and New York." [18 at p. 4] He has said he received "external pressure from donors and public officials." [18 at p. 5]

Even if external heckling justified action, Boyce has not produced any of these emails, text messages, or social media posts. He has not identified any of the "external" persons who pressured him to publicly fire Lauren.

Boyce has said the University elected not to post a remembrance of the terrorist attack on September 11, 2001 on social media that day, to avoid unwanted comments. [18 at p. 4] But if it wanted to avoid comments, it could have simply turned the comment function off.

Boyce has said the University paused a "phone-a-thon," by which students call potential donors, for that day and "the rest of the week." [18 at p. 5] But the rest of the week was Friday only, and on information and belief there are no phone-a-thons on football Fridays anyway.

The reality is no classes were cancelled. By contrast, the evidence will show that classes were cancelled because of the October 29 Turning Point USA event. [E.g., 21-5]

No one on campus complained about Lauren. Lauren's coworkers did not complain about Lauren. Lauren's coworkers expressed to her their dismay that she was terminated.

―――――――

Even if Boyce could point to the kind of disruption that justified action, it did not justify a termination.[5] The University might have announced that it had placed Lauren on administrative leave, as it sought fit to do at 9 a.m., to let things die down.

Instead, Boyce, allowing no breathing room, publicly condemned and fired Lauren on Facebook. He threw a boulder in a modern-day public stoning.

Boyce argues he was not required to wait for a disruption. Courts sometimes defer to a government employer's reasonable prediction of disruption, but that is not a license to terminate an employee for a point of view. Disruption necessarily means something more than "a large volume of emails, text messages, and social media posts." In any event, Lauren did not cause any disruption; her doxers did. Boyce has pointed to the "1.3 million views"[6] that his press release got as justification for her firing. [18 at p. 6] If that is Boyce's justification, then by his analysis he can outsource the firing of an administrative employee to an online mob. That is not the law.

Boyce cannot carry his burden to justify terminating Lauren by pointing solely to external hecklers. Other courts have already readily held that public reaction is insufficient to establish the kind of disruption that would justify adverse action against an employee under these very same circumstances—and in those cases, the decisionmaker at least purported to investigate before making a final decision. *Hook v. Rave*, No. 4:25-cv-04188-KES, 2025 WL 2720978 (D.S.D. Sept.

---

[5] Even if Lauren had done something wrong, the University's policy for non-faculty employees provides for progressive discipline, which includes three steps. Termination is "[t]he last and most serious step." Behavior that may result in immediate termination includes "illegal" behavior and "theft, substance abuse, intoxication, fighting and other acts of violence at work." Lauren did not do any of those things.

[6] The University posted Boyce's press release on X, too. Without knowing more, one might presume that a meaningful share of the views can be attributed to bots.

Webster's defines "bot" as: "a computer program that performs automatic repetitive tasks *especially*: one designed to perform a malicious action." Bot, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/bot (last visited on December 22, 2025).

24, 2025); Doc. 13, Order, *Crook v. Creston Comm. Sch. Dist.*, No. 4:25-cv-00373-RGE-HCA (S.D. Iowa Oct. 20, 2025). Boyce has pointed to another recent case, *Brown v. Young*, No. 4:25-cv-419-MW-MJF, 2025 WL 3171160 (N.D. Fla. Nov. 13, 2025), in which he says a court denied the plaintiff's motion for preliminary injunction. The court did deny the plaintiff's motion, but not because it agreed with the employer. Instead, it denied the plaintiff's motion because the record was undeveloped. *See id.* at *4 (observing that the plaintiff had not cross-examined the employer's declarant at the motion's hearing).

Boyce cites *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 420 (5th Cir. 2023). *McLin* is instructive, but not for the reasons Boyce offers. The employer in *McLin* was a court. The employee in *McLin* was a clerk whose job was to interact with the public. The employee joked on Facebook about running over Black Lives Matter protesters with her horse trailer. According to the Fifth Circuit: "Not only would a public Facebook post about running over Black Lives Matter protestors pose a threat to amicable workplace relationships, it strikes a blow against the [court] by undermining its efforts to stay true to the fact and image of a court whose 'paramount purpose [is] providing a fair and impartial open forum in which the public may resolve its disputes.'" *Id.* at 420 (citation omitted). The district court's opinion further explained: "Plaintiff did not make her post 'private,' or even limit her post to her Facebook 'friends'; instead, she made her post 'public,' available to anyone capable of conducting an internet search. And, again, Plaintiff's remarks most certainly may be characterized as overtly hostile. It is one thing to articulate a disagreement with protesters' methods, it is quite another to publicly state '#IWillrunYouOver.'" *McLin v. Twenty-First Jud. Dist.*, 614 F. Supp. 3d 278, 291–92 (M.D. La. 2022).

*McLin* is not this case. Lauren's repost was private. It was not overtly hostile. It did not pose a threat to amicable working relationships. It did not undermine confidence in the integrity of the University.

This is all to say: Lauren's First Amendment claim is more than "plausible." Boyce is not entitled to dismissal for the asserted reason that she has not stated a claim upon which relief may be granted.

2. Boyce is not entitled to qualified immunity.
   a. Qualified immunity would only protect Boyce in his personal (not official) capacity.

Boyce invokes the doctrine of qualified immunity. Qualified immunity is a defense to § 1983 claims, but, where it applies, it only applies to protect a defendant, in his personal capacity, from liability for damages. To the extent it applies here, it only applies to protect Boyce, in his personal capacity, from liability for damages. It does not otherwise affect Lauren's case.

   b. Lauren preserves the argument that qualified immunity is unlawful.

The doctrine of qualified immunity is a judicially created doctrine. It does not derive from the Constitution or any statute; the Supreme Court created it in 1967. It has many critics, but until a higher court says otherwise, it is the law. Lauren preserves for appellate review, if any, the argument that qualified immunity is unlawful. *See, e.g., Green v. Thomas*, 734 F. Supp. 3d 532, 540 (S.D. Miss. 2024), *aff'd in part, rev'd in part*, 129 F.4th 877 (5th Cir. 2025) ("Most plaintiffs in this situation argue that the officer that wronged them isn't entitled to qualified immunity. Green does that. Unlike others, though, he has taken the next step and argued that qualified immunity is itself unlawful. He joins lawyers, professors, judges, and even Supreme Court Justices who have called for the doctrine's re-evaluation, if not its abolition.").

      c. Qualified immunity does not apply here.

Whether the doctrine is unlawful, it does not apply here. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity does not apply here because Boyce exercised power irresponsibly and unreasonably.

The test, for qualified immunity purposes, has two parts. A plaintiff must show "(1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (quotation marks and citation omitted).

Lauren has already shown that the First Amendment protects her, such that Boyce's termination of her violated her constitutional right. The only question, then, is whether that right was clearly established at the time Boyce terminated her. The answer is yes.

      i. Pre-existing law was sufficiently clear.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Every reasonable university president would have understood that an employee has First Amendment rights and he could not terminate her for privately expressing a point of view.

The facts are Lauren was an administrative assistant; she did not have the kind of job that gives an employer greater power to restrict an employee's speech. Lauren's repost was after work, on a private account, and did not pertain to the University. The repost itself "reflected positions that represent 'by no means an isolated segment of public opinion.'" *MacRae*, 145 S. Ct. at 2620 (Thomas, J., joining but writing separately respecting the denial of certiorari).

Lauren did not cause any disruption to anyone; her doxers did. By the University's own account, any disruption to the University was external only. No classes were cancelled. (By contrast, the evidence is that classes were cancelled because of the October 29 Turning Point USA event. [21-5]) No one on campus complained about Lauren. Lauren's coworkers did not complain about Lauren.

On these facts, there is no legitimate explanation for Boyce's decision to fire Lauren. The University had only just put Lauren on administrative leave, for her own safety, when, at 10:15 a.m., Boyce called for a "complete separation." Nothing had changed, certainly Lauren did not do anything, that required her termination.

Whether it is even necessary to the instant analysis, the facts strongly suggest that what Boyce wanted was to publicly fire Lauren, not because she did anything wrong, but because he wanted credit for doing it. He apparently drafted his Facebook post publicly announcing the firing before the firing was even communicated to Lauren. He has pointed to its alleged "1.3 million views" as justification for the firing—but all he succeeds in establishing is that he was motivated by, and fed, an online mob.

These are not facts that justify a termination of an employee. Boyce, and certainly the University's general counsel's office, to the extent that it advised him, should have known that Boyce could not fire Lauren for private speech on a matter of public concern. The U.S. Supreme Court held *in 1987* that the First Amendment protected even a public employee who expressed approval of an attempted assassination of President Reagan. *Rankin v. McPherson*, 483 U.S. 378, 390–91 (1987) ("Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal."). *See also* Rankin, 483 U.S. at 393 (Powell, J., concurring) ("If a statement is on a

matter of public concern, as it was here, it will be an unusual case where the employer's legitimate interests will be so great as to justify punishing an employee for this type of private speech that routinely takes place at all levels in the workplace. The risk that a single, offhand comment directed to only one other worker will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful."). The facts in *Rankin* are materially identical facts. To the extent they are different, they are different in ways that help, not hurt, Lauren's case. The public employee in *Rankin* made her comments at work, her comments were her own, and her comments were hostile inasmuch as she said: "If they go for him again, I hope they get him." If the First Amendment protected the public employee in *Rankin*, it certainly protects Lauren here.

Lauren anticipates that Boyce will argue the U.S. Supreme Court in *Rankin* did not contemplate social media. But social media does not change the analysis. There is no authority for the proposition that speech on social media is less protected. Speech on social media is entitled to as much protection as speech in any other format. *Cf. Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 191 (2021) ("Consider too when, where, and how B. L. spoke. Her posts appeared outside of school hours from a location outside the school. She did not identify the school in her posts or target any member of the school community with vulgar or abusive language."). *See also Brown v. City of Tulsa*, 124 F.4th 1251 (10th Cir. 2025) (denying chief of police's motion for qualified immunity and holding a police department in Tulsa could not terminate an officer whose social media posts were racially inflammatory solely on the basis of his views).

Even entertaining the argument that social media changes the analysis, and it does not, it remains that "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Andrew v. White*, 604 U.S. 86, 95

(2025) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). "After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) (Gorsuch, J., for the majority). *See also Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (reversing Fifth Circuit's grant of qualified immunity, notwithstanding alleged "ambiguity" in the law, where constitutional right was clear and no "necessity or exigency" justified its violation) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citations omitted)).

Certainly, in the light of the pre-existing law, including but not limited to *Rankin*, Lauren's constitutional right was clearly established at the time Boyce terminated her. A reasonable university president would have understood that he could not terminate her, and that is before accounting for the viewpoint discrimination inherent in Boyce's decision. When one accounts for the viewpoint discrimination in Boyce's decision, the answer is even clearer. A public employer cannot "adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption." *MacRae*, 145 S. Ct. at 2620 (Thomas, J., joining but writing separately respecting the denial of certiorari).

      ii. Disruption is a "fact-reliant question."

If pre-existing law were not clear enough, Boyce still would not be entitled to qualified immunity to the extent there remain questions of fact that cannot be resolved on a motion to dismiss. The Fifth Circuit recently reversed a district court's grant of qualified immunity in a case in which the plaintiff plausibly alleged viewpoint discrimination. *See Biggers v. Massingill*, No. 23-11023, 2025 WL 429974 (5th Cir. Feb. 7, 2025). That plaintiff claimed he was silenced during a public meeting because a commissioner disagreed with his point of view. *See id.* at *2 ("Biggers alleged he was silenced by Massingill—not because he was disrupting those meetings—but because Massingill disagreed with Biggers's views about the HCCC. That is a textbook violation of the First Amendment."). The commissioner claimed his behavior was "far outside the boundaries of civilized discourse and was patently disruptive." *Id.* at *2 n.2. In a per curiam opinion, Judges Ho, Duncan, and Oldham observed that whether the plaintiff was disruptive was "obviously a 'fact-reliant question unsuited for resolution at the motion to dismiss stage.'" *Id.* The case was not a termination case, but the same obvious principle applies equally here.

    ———

The takeaway is Boyce is not entitled to qualified immunity for at least two reasons: He is not entitled to qualified immunity, as a matter of law, because precedent provided him sufficient notice that the First Amendment protected Lauren such that he could not lawfully do what he did. He is not entitled to qualified immunity, as a matter of fact, because, to the extent he insists Lauren's repost was disruptive, disruption is a "fact-reliant question unsuitable for resolution at the motion to dismiss stage."

3. The Eleventh Amendment is no obstacle to this case.

The Eleventh Amendment immunizes states from judgments awarding damages, and that immunity extends to state universities and their presidents in their official capacities. Lauren does not dispute that she cannot obtain damages from Boyce in his official capacity. She seeks damages from Boyce in his personal capacity only. The Eleventh Amendment does not immunize Boyce from a judgment against him in his personal capacity.

The Eleventh Amendment does not immunize states, and by extension Boyce in his official capacity, from judgments that are "declaratory or injunctive in nature and prospective in effect." *Corn v. Mississippi Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir. 2020). Lauren does not dispute that she cannot obtain a declaration that Boyce in his official capacity violated her rights in the past. But she may obtain a declaration that Boyce in his official capacity is violating her rights in the present by failing to reinstate her. *Corn*, 954 F.3d at 275–76 ("Plaintiffs must show 'that [Fisher is currently] violating federal law, not simply that the defendant has done so.'") (citation omitted). Boyce does not dispute that she may obtain injunctive relief.

This is all to say: The parties do not actually dispute the contours of the Eleventh Amendment's immunity, and it is not an obstacle to this case.

4. There is no reason to decide this motion out of order.

Lauren elsewhere has explained that it only makes sense to decide her motion for preliminary injunction first. [21] That motion asks whether she is likely to prove Boyce's termination of her employment violated the First Amendment. In other words, does the First Amendment protect her? If she is right, and she is, she is entitled to a restoration of the status quo for the pendency of this case.

The instant motion, Boyce's motion to dismiss, argues Boyce is entitled to qualified immunity from personal liability for damages. As shown, the question, for that purpose, is, assuming the First Amendment protects Lauren, did the law give Boyce sufficient notice? The Court necessarily has to decide the issue raised by Lauren's motion for preliminary injunctive relief (does the First Amendment protect Lauren?) before it decides whether Boyce is entitled to qualified immunity (did the law give Boyce sufficient notice?).

To be sure, courts address motions invoking qualified immunity promptly. But the pending motion for preliminary injunctive relief, currently set for hearing on January 12, does not seek damages and so does not implicate qualified immunity. There is no reason to decide the two motions out of order here, and Boyce has not pointed to any.[7]

## CONCLUSION

For the reasons stated here and, to the extent relevant, in Lauren's briefs in support of her motion for preliminary injunctive relief, the Court must deny Boyce's motion to dismiss.

---

[7] Boyce does not cite any authority for deciding the motions out of order here. He cited authorities in his opposition to Lauren's motion for preliminary injunctive relief. Lauren showed in her reply that none of the authorities cited stands for the proposition that the Court should postpone deciding her motion. [21 at p. 2 n.1]

Respectfully submitted,

*Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
Fax: 504-586-5253
alysson@alyssonmills.com

for Lauren Stokes

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

/s/ Alysson Mills

Alysson Mills, Mississippi Bar No. 102861