UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| LAUREN STOKES,<br><br>    Plaintiff,<br><br>  v.<br><br>GLENN BOYCE, CHANCELLOR OF THE UNIVERSITY OF MISSISSIPPI, in his official and personal capacities,<br><br>    Defendants. | Case No. 3:25-cv-307-GHD-RP<br><br>District Judge Glen H. Davidson<br><br>Magistrate Judge Roy Percy |

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held an evidentiary hearing on Plaintiff Lauren Stokes's motion for preliminary injunction [5] on February 13, 2026. After, the Court invited the parties to submit proposed findings of fact and conclusions of law. Stokes proposes the following, which she offers in supplement to her prior filings:

**Facts**

On Wednesday September 10, 2026, Lauren Stokes was employed by the University of Mississippi as an executive assistant to Charlotte Parks, the vice chancellor for development. Parks's job was to meet with donors. Stokes's job was administrative only. Stokes managed Parks's calendar, arranged her travel, made dinner and lunch reservations for her, assembled materials that she might need for meetings, secured conference rooms, and tended to audiovisual needs. [Hearing transcript at 7:7] Stokes rarely interfaced with donors herself. [Hearing transcript at 7:20]

September 10 was a normal work day for Stokes.  After work at the University, she went to her other job at the restaurant she shares with her husband.  Defendant Glenn Boyce, the University's chancellor, dined there that evening.  [Hearing transcript at 9]

At some point that evening, Stokes reposted on her private Instagram account the following post about Charlie Kirk, which was written by someone else:

> For decades, yt supremacist and reimagined Klan members like Kirk have wreaked havoc on our communities, condemning children and the populace at large to mass death for the sake of keeping their automatic guns. They have willingly advocated to condemn children and adult survivors of SA to forced pregnancy and childbirth. They have smiled while stating the reasons people who can birth children shouldn't be allowed life-saving medical care when miscarrying. They have incited and clapped for the brutalizing of Black and Brown bodies. So no, I have no prayers to offer Kirk or respectable statements against violence.  @thecollectress

[Hearing exhibit 1]

Stokes left the restaurant around 7:30 p.m. and called her husband.  He told her he had received some calls about the repost.  When Stokes got home, she took the repost down and posted the following apology:

> I am so truly and deeply sorry to those I have offended. We are lucky enough to know and employ people from all walks of life-trans, MAGA, cat lovers, dog lovers, republicans, independents, and democrats.  In all facets we strive to be kind and hold space for all.  My husband and I do not support violence of any sort.  It was reposted in a heated moment (on the Internet?! Never heard of such!) I apologize to those I have offended and look forward to getting off the internet to reevaluate kindness, privacy, and respect for all

[Hearing exhibit 2]

But it was too late; Stokes was already being doxed.[1]  Someone had taken a screenshot of the private repost and shared it with someone else.  Eventually, someone else shared it publicly

---

[1] Webster's defines "dox" as: "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." Dox, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox (last visited on December 16, 2025).

Doxing is a crime in some states.  *See* The Council of State Governments, *Doxing: State Protections Against Digital Threats*, October 27, 2025, *available at* https://www.csg.org/2025/10/31/doxing-state-protections-against-digital-threats/.

online. Once it was shared publicly online, it went viral. An angry social media mob trolled[2] Stokes and called for retribution. Her personal information was posted and shared to encourage people to harass her online, which they did. [Hearing transcript at 14:20]

At around 10:30 p.m., Parks texted Stokes to check on her. Parks wrote: "Lisa Stone just called me and said you are getting attacked on-line. I am so sorry." Stokes thanked Parks for checking on her and apologized. Parks responded: "Gracious no! I am just worried about you. I hope people are more rational in the morning. These are crazy times." [Hearing exhibit 3] Stokes was "humiliated that this was happening" but "felt really supported" by Parks. [Hearing transcript at 14:10]

On Thursday morning, September 11, Parks and Stokes exchanged emails about work, and Stokes told Parks that she would go to the human resources office, HR, first thing to report that she had been doxed. [Hearing exhibit 4]

At HR, at approximately 9:00 a.m., the University placed Stokes on paid administrative leave "in [her] best interest," "for [her] safety." [Hearing exhibit 5; hearing transcript at 16] HR asked the University Police Department, UPD, to speak with Stokes. Stokes recalled that "UPD assured me that I would be safe on campus" but "suggested that I speak to the Oxford Police Department." [Hearing transcript at 16:14]

Nothing changed between 9:00 a.m. and 10:15 a.m. But at 10:15 a.m. Boyce decided he wanted "complete separation." [18 at 5]

Accordingly, at approximately 10:30 a.m., Parks called Stokes and asked her to consider resigning. Parks called again at approximately 11:30 p.m. and told Stokes that she could have an

---

[2] Webster's defines "troll" as: "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content." Troll, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox (last visited on December 16, 2025).

hour to decide.  When Parks called again at approximately 12:50 p.m., Stokes told her that she did

not have an answer.  Parks then told her that she was fired.  Bradley Salters, from HR, was on the

call and told Stokes that someone from the University would reach out to her after.  [Hearing

transcript at 18]

Just minutes later, at 1:08 p.m., Boyce sent the following email to all "faculty, staff and

students":

> Yesterday, a University of Mississippi staff member re-shared hurtful, insensitive
> comments on social media regarding the tragic murder of Charlie Kirk.  These
> comments run completely counter to our institutional values of civility, fairness and
> respecting the dignity of each person.  We condemn this action, and this staff
> member is no longer employed by the university.
>
> All of us have a responsibility to take seriously our commitment to upholding a civil
> and respectful campus environment.

[Hearing exhibit 9]

At the same time, Boyce issued the same statement as a press release and posted it on

Facebook.

Stokes, who was already suffering, was humiliated.  She felt Boyce's press release

"condemned me to my whole community" and "made it seem like I had done something wrong

when I hadn't."  In her words, Boyce made the matter "newsworthy."  [Hearing transcript at 19]

Two hours after the press release, Stokes and her husband received a bomb threat at their

restaurant.  [Hearing transcript at 20:6]

Stokes waited for someone from the University to reach out to her but they did not.  On

October 9 she finally received a letter.  The letter advised her to "request a review of this

termination" "within ten (10) business days."  [Hearing exhibit 7]  Stokes determined that the

review process, because it contemplated elevation to Boyce, did not apply to her situation.

[Hearing transcript at 22:5]  She still filed her complaint in this Court within ten business days, on October 21, and moved for preliminary injunctive relief on November 7.

This Court held an evidentiary hearing on the motion for preliminary injunctive relief on February 13, 2026.

Stokes called seven witnesses, including Stokes and faculty, staff, and students from the University, at the hearing.

Stokes testified to her employment and termination.

Faculty, staff, and students testified that Stokes's repost about Charlie Kirk did not disrupt the University on September 11.  No classes were cancelled because of Stokes; no one even knew about Stokes's repost before Boyce's email.  By contrast, these witnesses attested, the Charlie Kirk Turning Point event on October 29 was majorly disruptive.  Students were scared to come to campus that day.  Professors cancelled classes, and other prescheduled events were cancelled or moved off campus.  Those major disruptions notwithstanding, Boyce celebrated the event.

Boyce did not appear at the hearing.  His counsel did not call any witnesses in his defense.

## Law

### Motions for preliminary injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  A court considers four factors:

[1.] a substantial likelihood that plaintiff will prevail on the merits,

[2.] a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

[3.] that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and

[4.] that granting the preliminary injunction will not disserve the public interest.

*Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (quoting *Canal Auth. Of State of Fla. V. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

"The first factor—likelihood of success on the merits—is 'the most important.'" *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024).

When the government is a party, the third and fourth factors merge. *See Texas v. United States*, 809 F.3d 134, 187 & n.204 (5th Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging the factors in the context of stay of removal proceedings)).

"The decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (quoting *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984)).

### 1. "a substantial likelihood that plaintiff will prevail on the merits"

Stokes is likely to prevail on the merits of her claim that Boyce violated the First Amendment when he fired her.

*Public employees have First Amendment rights*

Public employees like Stokes have First Amendment rights. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("Public employees do not surrender all their First Amendment rights by reason of their employment."). *See also Lindke v. Freed*, 601 U.S. 187, 196–98 (2024) ("Freed did not relinquish his First Amendment rights when he became city manager.").

Stokes did not have the kind of job that gives a public employer greater power to restrict an employee's speech. The evidence is that Stokes's job was administrative only. [Hearing transcript at 7:22] She did not have policymaking authority. *Cf. Maldonado v. Rodriguez*, 932

F.3d 388, 394 (5th Cir. 2019) (district attorney could fire employees holding policymaking positions or having access to confidential materials that embody policymaking decisions: "Once the DA is selected, the office must be sensitive to that official's policy demands as represented to the voters.").

Stokes also did not purport to speak in any official capacity. *Cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) ("because that kind of speech is—for constitutional purposes at least—the government's own speech").

The speech in question is a social media post which Stokes reposted on a private Instagram account after work. It did not identify the University or target any member of the University community. "It is [] beyond debate that when a public employee engages in protected speech, it is immaterial that social media serves as the vehicle for such speech." *Jones v. Matkin*, 623 F. Supp. 3d 774, 790–91 (E.D. Tex. 2022) (citing cases). *See also, e.g., Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 191 (2021) ("Consider too when, where, and how B. L. spoke. Her posts appeared outside of school hours from a location outside the school. She did not identify the school in her posts or target any member of the school community with vulgar or abusive language.").

*Political speech is entitled to the highest protection*

The speech in question related to a subject of obsessive news interest and a matter of public concern to the nation. It was made in the middle of a robust public debate, at that very moment wildly raging everywhere. It "reflected positions that represent 'by no means an isolated segment of public opinion.'" *MacRae v. Mattos,* 606 U.S. ----, 145 S. Ct. 2617, 2620 (2025) (Thomas, J). Such speech lies at the heart of the First Amendment. First Amendment jurisprudence reflects the foundational understanding that "debate on public issues should be uninhibited, robust, and wide-

open." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted)).

> *Boyce's burden to prove a disruption necessarily is extraordinarily high*

When a public employer fires an employee for her speech, the law requires it to show the speech disrupted its actual operations. *E.g., Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968) (teacher's speech did not disrupt her school's actual operations); *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 378 (5th Cir. 2000) ("[The plaintiff's] letter would not have impeded the Library's general performance and operation: it did not have any bearing on the day-to-day business of circulating books within the community."); *Moore v. City of Kilgore*, 877 F.2d 364, 375 (5th Cir. 1989) (firefighter's speech did not disrupt firefighters' ability to fight fires).

The test, known as the *Pickering* test, is a balancing test. It weighs the interest in the employee's speech against the employer's interest in disciplining the employee for it. "The more central a matter of public concern the speech at issue, the stronger the employer's showing of counter-balancing governmental interest must be." *Jordan v. Ector Cnty.*, 516 F.3d 290, 299 (5th Cir. 2008) (citation omitted).

In other words, when the interest in the speech is high, the employer's burden is heavy. Because the interest in the speech here is extraordinarily high, Boyce must make an extraordinarily strong showing of disruption to justify firing Stokes.

*Boyce has not carried his burden to prove a disruption*

Boyce contends Stokes's repost disrupted the University's operations, but even by his own account any alleged disruption was external, fleeting, and largely online only, and Stokes did not cause it, her doxers did.

Boyce says the University received an alleged "large volume of emails, text messages, and social media posts" about Stokes and "external pressure from donors and public officials" to "take action." [18 at 4-5]   But there is no indication that these communications, if they are to be credited, warranted any deference.  *See, e.g.,* Doc. 52, Order, at p.14-15, *Crook v. Creston Comm. Sch. Dist.*, No. 4:25-cv-00373-RGE-HCA (S.D. Iowa Jan. 13, 2026) (communications "from outside of the District are not probative of disruption") (citing *Melton v. City of Forrest City, Arkansas*, 147 F.4th 896, 903 (8th Cir. 2025) (for disruption analysis, the focus is internal: "No current *firefighter* complained or confronted him about [the post].  Nor did any co-worker or supervisor refuse to work with him.")).  Boyce has not produced any of these emails, text messages, or social media posts.  He has not identified any of the "external" persons who he says pressured him to fire Stokes. Boyce himself did not appear at the Court's hearing on February 13 and resisted a subpoena to compel his appearance thereafter.  The Court cannot credit alleged facts that, at this stage, lack any substantiation and which Boyce himself chose not to appear to defend.

In a declaration, Lisa Stone, vice chancellor for marketing, says the University elected not to post a remembrance of the terrorist attack on September 11, 2001 on social media that day, to avoid unwanted comments. [17-2 at ¶5]  Also in a declaration, Charlotte Parks, vice chancellor for development, says the University paused a "phone-a-thon," by which students call potential donors, for that day (a Thursday) and the rest of the week (which would have been Friday only). [17-1 at ¶8] Stone and Parks also did not appear at the Court's hearing, so questions regarding

these alleged facts (why couldn't Stone simply turn comments off? doesn't Parks cancel "phone-a-thons" all the time?) remain. But even by their declarations' own accounts, Stone and Parks cancelled these things preemptively, merely to avoid the possible unpleasantness of encountering opposing points of view. "[F]or the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Mahanoy Area Sch. Dist*, 594 U.S. at 192-93 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969)).

Parks's declaration says UPD "agreed to have UPD officers patrol the area around the Development Office." [17-1 at ¶13] But even by Parks's declaration's account, if UPD patrolled the area, it was only because Parks asked them. There is no indication that UPD itself independently determined that there existed credible threats to the development office. *See, e.g.,* Doc. 52, Order, at p.18, *Crook v. Creston Comm. Sch. Dist.*, No. 4:25-cv-00373-RGE-HCA (S.D. Iowa Jan. 13, 2026) ("But the law enforcement presence was a direct result of Stender's request for the law enforcement presence, not a result of any substantiated threat."). The evidence is that UPD told Stokes that she would be safe on campus. [Hearing transcript at 16:16]

The evidence further is that, far from complaining about Stokes, co-workers who were aware of Stokes's doxing were sympathetic to her suffering. Text messages between Parks and Stokes reflect that Parks herself did not believe that Stokes had done anything wrong; Parks called the reaction online "crazy." [Hearing exhibit 3] Angela Atkins, who worked in the development office with Stokes, testified "it hurt me to know how bad she felt . . . [because of] the hate and vitriol that was coming her way." [Hearing transcript at 48:20] When the University put Stokes

on paid administrative leave at 9:00 a.m., it did so, in its own words, "in [her] best interest." [Hearing exhibit 6]

Nothing changed between 9:00 a.m., when the University put Stokes on paid administrative leave, and 10:15 a.m., when Boyce apparently simply decided he instead wanted "complete separation." [18 at 5] The evidence is that no one on campus even knew about Stokes's repost. Faculty, staff, and students testified that they learned about it only after Boyce sent an email to all faculty, staff, and students. [Hearing transcript at 57:23 ("I knew nothing about Lauren's post."); 64:23 ("I didn't know anybody that was talking about it"); 73:3 ("I don't remember anybody talking about her."); 86:4 ("I didn't even know who she was"); 92:21] They described Boyce's email as unusual; he had never announced the termination of an employee via email before. [Hearing transcript at 50:7 ("Absolutely unheard of."); 57:27 ("I right now cannot recall receiving another email like this."); 72:11 ("In my four years at Ole Miss, I can't think of anything similar to this."); 85:24 (I've never received an email like that."); 92:16]

If anything disrupted campus that day, it was Boyce's email, inasmuch as everyone talked about it after. [Hearing transcript at 58:1; 65:2; 73:9 ("They brought it up in class. Our professors brought it up. We were discussing it in my club organizations. It was – it was a real huge moment on campus, I think."); 86:8 ("Everyone was talking about it, at least in my circles, yeah.")]

In addition to his email to all faculty, staff, and students, Boyce issued a press release, which he posted on Facebook, announcing the termination. Stokes testified the press release had the effect of making her termination "newsworthy." [Hearing transcript at 19:23] She elsewhere has described it as throwing a boulder in a public stoning. [21 at 12] After Boyce's press release, she and her husband received a bomb threat at their restaurant. [Hearing transcript at 20:6]

Boyce argues he was not required to wait for Stokes's repost to disrupt campus. [18 at 10] He points to an alleged "1.3 million views" that his Facebook post received as justification for the termination. [18 at 6] But if Facebook views are a justification, then a government employer may outsource the firing of an employee to any online mob. That is not the law. Courts sometimes defer to a government employer's reasonable prediction of disruption, *e.g., Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 741 (5th Cir. 2015), but that is not license to fire an employee who did nothing wrong.[3]

Taken together, the evidence, at this juncture, is that Boyce fired Stokes, at best, because he wanted to avoid expected public reaction and, at worst, because he wanted credit for firing an employee who did not mourn Charlie Kirk.

Whatever Boyce's interest in avoiding expected public reaction, it does not outweigh an employee's interest in private speech on a matter of public concern. *E.g., Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1252 (10th Cir. 2024) ("Expected public reaction that impacts external relationships does not constitute a detrimental impact and does not weigh in the District's favor.")

---

[3] The Eighth Circuit in *Melton* recently denied a motion for qualified immunity where evidence of disruption was "thin":

> Keep in mind that, in addition to the lack of evidence supporting the mayor's prediction, his brief investigation could lead a reasonable jury to conclude that what he said masked the true reason for Melton's firing, which was a disagreement with the viewpoint expressed in the image. . . . If the First Amendment protects Melton's speech, one last hurdle remains: any constitutional violation must have been "clearly established." The jury's findings will play a role in making that determination too. Insufficient evidence of a disruption would be "fatal to the claim of qualified immunity" because there would be no governmental interest to weigh.

*Melton*, 147 F.4th at 904. Consistent with *Melton*, the Fifth Circuit recently observed that disruption is a "fact-reliant question." *See Biggers v. Massingill*, No. 23-11023, 2025 WL 429974 (5th Cir. Feb. 7, 2025) (whether the plaintiff was disruptive was "obviously a 'fact-reliant question unsuited for resolution at the motion to dismiss stage'").

Relevant here, the Court cannot simply take Boyce's word for it. Disruption, or the real risk of it, is something that must be reasonably proved.

(citing *Flanagan v. Munger*, 890 F.2d 1557, 1566–67 (10th Cir. 1989) ("Defendants' case revolves solely around evidence of the potential disruption of the department's external relationships and operations. Even if disruption of external operations could justify defendants' actions under *Pickering* and its progeny, their justification must fail under another theory. The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive ….")). To hold otherwise would constitutionalize the heckler's veto: "Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time." *Melton*, 147 F.4th at 903.

"Creating room for free speech in a hierarchical organization necessarily involves inconveniencing the employer to some degree. Speech concerning public affairs usually creates attendant inefficiencies in the running of the public entity." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 196 (5th Cir. 2005). "It is precisely the probability of oppressive over-reaction by the powers that be which requires our constant vigilance of the First Amendment protections accorded all public employees." *Jones v. Matkin*, 623 F. Supp. 3d 774, 790 (E.D. Tex. 2022) (quoting *Swilley v. Alexander*, 629 F.2d 1018, 1021 (5th Cir. 1980)). "Indeed, our experience tells us that the more important the subject matter is to the public, the sharper the reaction will be by those whose conduct may be called into question." *Id.*

Other courts have already held that alleged public reaction, in the form of "hundreds of calls and messages," was insufficient to establish the kind of disruption that would justify adverse action against an employee under these very same circumstances. *See Hook v. Rave*, No. 4:25-cv-04188-KES, 2025 WL 2720978, at *4 (D.S.D. Sept. 24, 2025) ("Defendants have not demonstrated that there was any disruption to on-campus activities, Hook's teaching lessons, or the University's operations."); Doc. 52, Order, at p.14, *Crook v. Creston Comm. Sch. Dist.*, No.

4:25-cv-00373-RGE-HCA (S.D. Iowa Jan. 13, 2026) ("The evidence of the timing of the District's response to Crook's post, reasonableness of the response, and actual impact the post had on the District's efficiency weigh against a finding of disruption."); *id.* at p. 17 ("four to six parents indicating a potential future intent to withdraw their children from a District of 1,300 students does not carry the day"). In those cases, the decisionmaker (a university president and school district superintendent) at least purported to investigate before making a final decision. Boyce, by contrast, allowed no space for consideration whatsoever.

Boyce says *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411 (5th Cir. 2023), supports his decision. *McLin* is instructive, but not for the reasons Boyce offers. The employer in *McLin* was a court. The employee in *McLin* was a clerk whose job was to interact with the public. The employee joked on Facebook about running over Black Lives Matter protesters with her horse trailer. According to the Fifth Circuit: "Not only would a public Facebook post about running over Black Lives Matter protestors pose a threat to amicable workplace relationships, it strikes a blow against the [court] by undermining its efforts to stay true to the fact and image of a court whose 'paramount purpose [is] providing a fair and impartial open forum in which the public may resolve its disputes.'" *Id.* at 420 (citation omitted). The district court's opinion further explained: "Plaintiff did not make her post 'private,' or even limit her post to her Facebook 'friends'; instead, she made her post 'public,' available to anyone capable of conducting an internet search. And, again, Plaintiff's remarks most certainly may be characterized as overtly hostile. It is one thing to articulate a disagreement with protesters' methods, it is quite another to publicly state '#IWillrunYouOver.'" *McLin v. Twenty-First Jud. Dist.*, 614 F. Supp. 3d 278, 291–92 (M.D. La. 2022).

*McLin* is not this case. Stokes did not publicly threaten to run over anyone. Her repost was private. It was not overtly hostile. There is no evidence that it posed a threat to amicable working relationships. There is no evidence that it undermined confidence in the integrity of the University. The evidence, by contrast, is that it was Boyce's email and press release, among other things, that caused students to question the University's neutrality.

Because the evidence is that Boyce fired Stokes, at best, merely to avoid expected public reaction to her repost, Boyce has not carried his burden to show a disruption sufficient to justify his termination of Stokes.

### *Boyce discriminated against a point of view*

The Court's analysis might end there, but the evidence is that Boyce did more than merely terminate an employee. He discriminated against a point of view.

Boyce's email to all faculty, students, and staff, amplified by the press release he posted on Facebook, intended to, and did, silence dissent. [Hearing exhibit 9] By calling the speech in question "hurtful, insensitive" and "completely counter to our institutional values," Boyce communicated that the speech's viewpoint was wrong. When he said "[w]e condemn this action, and this staff member is no longer employed," he communicated that expressing the speech's viewpoint, even privately, was a fire-able offense.

Viewpoint discrimination is the most dangerous kind. "[T]he First Amendment does not permit one side of a debate to use the government to cancel the other side." *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 383 (6th Cir. 2024) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Texas v. Johnson*, 491 U.S. 397, 399 (1989); *Snyder*, 562 U.S. at 458)) ("[T]he First Amendment protects individuals who refuse to salute the flag, or even burn it, and who engage in homophobic protests at military funerals, despite that such actions

deeply offend many people."). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (citation omitted).

Viewpoint discrimination is especially dangerous in the university setting. "[G]iven the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). *See also Healy v. James*, 408 U.S. 169, 180 (1972) ("the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large"); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring) ("These pages need not be burdened with proof, based on the testimony of a cloud of impressive witnesses, of the dependence of a free society on free universities."). Because "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" *Healy*, 408 U.S. at 180, "the dangers of viewpoint discrimination are heightened in the university setting." *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (citing *Rosenberger*, 515 U.S. 835 ("That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.")). *See also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1129–30 (11th Cir. 2022) (concurring opinion) ("A university that turns itself into an asylum from controversy has ceased to be a university; it has just become an asylum.").

Courts necessarily account for viewpoint discrimination in cases such as this. The *Pickering* test is a balancing test that considers all circumstances. Courts applying *Pickering* have

repeatedly held a public employer may not terminate an employee solely on the basis of his views. *Fenico v. City of Philadelphia*, F.4th 151 (3d Cir. 2023) (a police department in Philadelphia could not discipline police officers whose social media posts openly denigrated minority groups solely on the basis of their views); *Brown v. City of Tulsa*, 124 F.4th 1251 (10th Cir. 2025) (a police department in Tulsa could not terminate an officer whose social media posts were racially inflammatory solely on the basis of his views); *Jorjani v. New Jersey Inst. of Tech.*, 151 F.4th 135, 144 (3d Cir. 2025) (a public university in New Jersey could not terminate a lecturer whose private speech glorified Hitler solely on the basis of his views: "NJIT posits that because Jorjani offered views it disliked, the First Amendment should not apply, and it is entitled to summary judgment. We cannot agree, lest we permit 'universities to discipline professors, students, and staff any time their speech might cause offense.'"). *See also, e.g., Hiers v. Bd. of Regents of the Univ. of N. Texas Sys.*, No. 4:20-cv-321-SDJ, 2022 WL 748502, at *12 (E.D. Tex. Mar. 11, 2022) ("[E]ven if *Pickering* applies rather than some higher form of scrutiny, the facts alleged support a plausible conclusion that the university officials engaged in unconstitutional viewpoint discrimination when they discontinued Hiers's employment."). The same principles apply here.

### *Boyce established an institutional viewpoint*

Relatedly, Boyce did not merely discriminate against a point of view—he created for the University an institutional viewpoint and discriminated against dissent.

The evidence, which Boyce did not rebut, is that faculty, staff, and students interpreted his email and press release to "tak[e] a side" in a political debate. [Hearing transcript at 93:9 ("I guess I was kind of surprised that it had been so, like, blatantly, I felt, taking a side."); 86:16 ("we all kind of know where the school stands in terms of politics")] The email and press release

communicated: The University mourns Charlie Kirk.  If you do not mourn Charlie Kirk, do not speak, or speak at your own peril.

That the University, through Boyce, has adopted a pro-Charlie Kirk view is supported by testimony that Boyce works closely with Charlie Kirk's Turning Point USA student group and assisted it with the Charlie Kirk event they organized on campus on October 29.  [Hearing transcript at 75]  Student perception is that the University, through Boyce, "absolutely" supported the Charlie Kirk event.  [Hearing transcript at 94:12 ("[T]he university seemed enthusiastic, I feel.  It was the students – a lot of students, I felt, that – were not happy about the Turning Point event."); 75:2 ("It was definitely very clear to me that he had a part in that.  My understanding is he works very closely with Turning Point's student organization and had a very, very close role in championing that event.")]  That perception is supported by evidence that Boyce attended the Charlie Kirk event and was photographed there holding a sign that read: "I am Charlie Kirk."  [Hearing exhibit 10]

Senior Calvin Wood, who helped organize the College Democrats' counter-event, observed that the University, through Boyce, invested enormous resources in the Charlie Kirk event.  According to Wood, "it was more coordination than they have ever, ever in my time here even communicated with College Democrats or Southern Progressives Alliance."  [Hearing transcript at 75:13]  He testified "[t]he most they did to support our [counter-]event was send[] an IT guy to set up the projector."  [Hearing transcript at 75:13]  He testified that while the University was "changing traffic and parking and working with Secret Service and all that stuff" "on that side of campus," "we were made to pay for our own security."  [Hearing transcript at 75:11; 81:21]

Senior Elizabeth Wildman, who also helped organize the College Democrats' counter-event, testified, "I've been … working in a Democrat organization on campus for years, and I've

felt little to no support from the university." [Hearing transcript at 88:25]. She said Boyce's celebration of the Charlie Kirk event in the news media "feels like a slap in the face." [Hearing transcript at 89:4]

Faculty, staff, and students testified the Charlie Kirk event was very disruptive of campus. [Hearing transcript at 78:9 ("[T]he rally that was held on our campus shut down campus for the day in the middle of a school week, and a lot of people didn't ask for that. And a lot of people would absolutely disagree that it was this big triumphant moment for Ole Miss.")] Professors cancelled classes because students were scared to be on campus that day. [21-5; hearing transcript at 59:15 ("there were many students who were concerned about coming to class"); 60:1 ("They were worried for their safety. … there was an enormous amount of law enforcement presence … [and] the nature of the event and the sponsor … was deterring students from wanting to come to campus."); 74:4 ("As I was walking around campus, it was really clear to me that no classes were happening. The only people on campus were in Trump hats and TPUSA shirts and on their way to the event where there were reporters."); 94:3 ("a lot of professors did cancel their classes, yes")]. Other prescheduled events were cancelled or moved off campus. [Hearing transcript at 67:18 ("[W]e decided we would just go ahead and cancel music lessons because it was in an area that would be impacted by Pavilion traffic. And some of my staff requested to work remotely that day. … And then I had another work-related meeting that was supposed to be held on campus that day. It was moved off campus.")] Dr. James Thomas testified the University allowed for these disruptions, inasmuch as it provided "guidance" that such cancellations for the Charlie Kirk event were okay. [Hearing transcript at 59:6]

Taken together, the evidence, at this juncture, is that the University, through Boyce, has adopted an institutional viewpoint that preferences employees and students who hold pro-Charlie

Kirk views. Even Boyce's own filings appear to support this conclusion. Boyce says he had to be seen as taking action against Stokes because today half of the University's students are from out-of-state and "comments on social media represented … strong engagement in Texas, California, Florida, Illinois, and New York—several states which are among the University's priority recruitment markets." [18 at 4] The only takeaway is that Boyce feared that being soft on anyone who did not mourn Charlie Kirk would offend prospective out-of-state students who hold pro-Charlie Kirk views. Apparently even in recruitment, Boyce preferences one kind of student over another.

"It undermines core First Amendment values to allow a government employer to adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption." *MacRae,* 145 S. Ct. at 2620 (Thomas, J.). That is what the University, through Boyce, has done here. The net effect is that students who do not hold pro-Charlie Kirk views, including students from Mississippi, feel unwelcome at their University. Lauren Hite, from Jackson, a graduate of the University and a first-year graduate student, testified her feelings about the University have changed. She explained the University "just doesn't feel like it's a place where I could really prosper anymore and, like, feel, I guess comfortable and supported by the administration." [Hearing transcript at 95:10] The firing of Stokes, and its communication to faculty, staff, and students, encourages that sentiment.

This is not to judge the merits of any viewpoint, but instead to underline that Boyce has caused the University to do something a public institution cannot do, which is discriminate based on one.

To summarize, at this juncture, Boyce has not carried his burden to show a disruption sufficient to justify his termination of Stokes. The evidence is that Boyce fired Stokes, at best,

because he wanted to avoid expected public reaction and, at worst, because he wanted credit for firing an employee who did not mourn Charlie Kirk. In doing so, he did not merely discriminate against a point of view, he created for the University an institutional viewpoint that silences dissent and preferences employees and students who hold pro-Charlie Kirk views. Stokes is likely to succeed on the merits of her claim that Boyce's firing of her violated the First Amendment.

### 2. "a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted"

In the ordinary wrongful termination case, a plaintiff is not entitled to a preliminary injunction, no matter the strength of her case, because her injury is reparable through damages. *Sampson v. Murray*, 415 U.S. 61 (1974). She already has an adequate remedy at law.

But this is not an ordinary wrongful termination case; this case alleges the termination violated the First Amendment. The injury from the loss of First Amendment freedoms is not reparable solely through damages. *See Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *7 (5th Cir. Feb. 17, 2022) (citing *Samson* and explaining that harm from loss of First Amendment freedoms is "independent" from harm from adverse employment decision itself). There is no other adequate remedy at law. For this reason, in First Amendment cases, irreparable injury is presumed. Indeed, Fifth Circuit precedent unambiguously holds that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," for purposes of obtaining a preliminary injunction. *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("Most basically, Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment and RLUIPA rights.")). *See also, e.g., Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (teacher who alleged he was terminated in violation of the First Amendment was entitled to preliminary injunction: "'When a plaintiff has shown a

likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied.' First, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' Second, 'it is always in the public interest to protect constitutional rights.' Third, 'the balance of the equities generally favors the constitutionally-protected freedom of expression.'" (citations omitted)); *Whitfield v. Chartiers Valley Sch. Dist.*, 707 F. Supp. 2d 561, 571 (W.D. Pa. 2010) (school administrator who alleged her contract was not renewed in violation of the First Amendment was entitled to preliminary injunction: "It has long been settled that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"); *Conn v. Board of Educ. of City of Detroit*, 586 F.Supp.2d 852, 865 (2008) (teachers who alleged they were terminated in violation of the First Amendment were entitled to preliminary injunction: "[I]n the context of a claim alleging retaliatory discharge for exercise of First Amendment rights, the Sixth Circuit has found that 'an individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit such as employment.'") (quoting *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The majority of federal circuit courts, however, have concluded that an individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit such as employment.")).

Applying that unambiguous precedent here, Stokes's irreparable injury in the absence of a preliminary injunction is presumed.

3. **"the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant"  and**

4. **"granting the preliminary injunction will not disserve the public interest"**

When the government is a party, the third and fourth factors merge. *See Texas*, 809 F.3d at 187 & n.204 (citing *Nken*, 556 U.S. at 435).  Because a preliminary injunction would vindicate her First Amendment rights, Stokes satisfies both factors.  "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).  "The public has a strong interest in protecting constitutional rights." *JXN Undivided Coal. v. Tindell*, 771 F. Supp. 3d 872, 878 (S.D. Miss. 2025) (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012)).

The evidence also supports that a preliminary injunction will serve the public interest in this case.

The evidence, which Boyce did not rebut, is that his email and press release have chilled protected speech and expressive activities.  Faculty, staff, and students understood Boyce's email and press release to "sen[d] a message to the entire campus."  [Hearing transcript 72:24]

Dr. Wendy Pfrenger testified "a lot of folks were feeling unsettled" about it. [Hearing transcript at 65:4]  She "knew people who were feeling fear about what can I say and can't I say as a public employee."  [Hearing transcript at 68:12]  She testified that she loves the University and her work for it, but she and her colleagues felt "shame" when a candidate for a vacancy withdrew because they did not "want to work in a place that doesn't protect its employees' rights."  [Hearing transcript at 68:19]

Senior Elizabeth Wildman testified "organizations like the Black Student Union and NAACP … didn't want to encourage their members to even go [to the counter-event] because they

were scared something might happen to them if they did." [Hearing transcript 87:17] She described the climate on campus as "scary." She explained that, if "people are, you know, scared to even come to an event," she "worried that people [like her] aren't going to want to come here [for school]." [Hearing transcript at 89:16]

A preliminary injunction, in the form of returning the parties to the status quo *ante*, serves to counteract the chilling effect Boyce's firing of Stokes has had on campus.

To the extent Boyce complains that the University already filled Stokes's position, the Court cannot hold that fact against Stokes. The University advertised the position on September 30 [21-2] before it sent Stokes a termination letter, which she did not receive until October 9. The letter advised Stokes to "request a review of this termination" "within ten (10) business days." [Hearing exhibit 7] Stokes filed her complaint within ten business days, on October 21, and filed the instant motion on November 7. She did not delay anything.

To the extent Boyce argues restoring Stokes's employment otherwise harms the University, he offered no evidence.

## Conclusion

Because Stokes has a likelihood of success and otherwise satisfies the requirements of a preliminary injunction, the Court must grant her motion and return the parties to the status quo *ante* pending a final trial on the merits.

Respectfully submitted,

/s/ Alysson Mills

Alysson Mills, Mississippi Bar No. 102861
650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
504-586-5253
alysson@alyssonmills.com

/s/ Lilli Evans Bass

Lilli Evans Bass, Mississippi Bar No. 102896
Brown Bass & Jeter, PLLC
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
601-487-8448
bass@bbjlawyers.com

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

/s/ Alysson Mills

Alysson Mills, Mississippi Bar No. 102861