**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**LAUREN STOKES,**                                                                 **PLAINTIFF**

**v.**                                               **Case No.: 3:25-cv-307-GHD-RP**

**GLENN BOYCE, CHANCELLOR OF
THE UNIVERSITY OF MISSISSIPPI,
In his official and personal capacities,**                         **DEFENDANT**

**DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Lauren Stokes has asked this Court to preliminarily alter the status quo by reinstating her to her former position at the University of Mississippi when someone else now occupies that job. The facts and the law do not support this extraordinary relief. Even after an evidentiary hearing, Plaintiff has not offered proof that she faces a substantial threat of irreparable injury. She has not addressed the Chancellor's undisputed proof that her social media post disrupted University operations. She has failed to show the balance of harms favors her application. This Court should deny Plaintiff's request for preliminary relief.

**PRELIMINARY INJUNCTION STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy that should only be granted when the movant has clearly carried the burden of persuasion" to prove: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the preliminary injunction is not granted, (3) the threatened harm to the plaintiff outweighs the harm the preliminary injunction may do to the defendant, and (4) granting the preliminary injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

A prohibitory preliminary injunction "freezes the status quo, and is intended 'to preserve

the relative positions of the parties until a trial on the merits can be held.'" *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Here, Plaintiff has sought a mandatory injunction ordering the Chancellor to reinstate her to her previous employment. A mandatory injunction, "which goes well beyond simply maintaining the *status quo pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Because rules of procedure and evidence are "less formal" at the preliminary injunction stage, the Court may rely on otherwise inadmissible hearsay evidence, including declarations or affidavits. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *see also Valentine v. Collier*, 956 F.3d 797, 801 n.1 (5th Cir. 2020) (noting that defendant was not required to introduce "live testimony" at preliminary injunction because "[i]t has long been true that parties can present evidence at the preliminary-injunction stage with declarations or affidavits" and because "it's the Plaintiff's burden to prove their entitlement to an injunction").

**ARGUMENT**

*1.  Plaintiff has not proven a substantial threat of irreparable injury.*

Preliminary injunctions "do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). Rather, their purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held … and to balance the equities as the litigation moves forward." *Id*. (internal quotations omitted). *See also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."). As one District Court in this Circuit has put it, the question for the Court in weighing a

2

request for a preliminary injunction motion is whether a final ruling on the merits of the plaintiff's claims would be "too little, too late." *Sherpa v. Almodovar*, No. 3:25-CV-01718 SEC P, 2026 U.S. Dist. LEXIS 4531, at *5 (W.D. La. Jan. 9, 2026).

"Irreparable harm" is "harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *see also Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (citing *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary damages.").

Alleged harms resulting from an employer's decision to terminate a plaintiff's employment are typically not irreparable because they can be compensated by money damages. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that terminated federal employee could not show irreparable harm because "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury"); *Morgan*, 518 F.2d at 240 (holding that employee's loss of income and emotional distress resulting from termination did not establish irreparable injury); *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 U.S. App. LEXIS 4347, at *15 (5th Cir. Feb. 17, 2022) ("In lawsuits alleging wrongful termination or adverse employment action, the plaintiff is ordinarily not irreparably harmed.").

This Court has recognized in other First Amendment retaliation cases that a loss of income is not sufficient to establish irreparable harm. *See Holcombe v. City of Tupelo*, No. 1:08CV288-SA-SAA, 2009 U.S. Dist. LEXIS 4045, at *5 (N.D. Miss. Jan. 12, 2009) (holding

3

that First Amendment plaintiff had not shown irreparable harm because "damages will normally be an adequate remedy for loss of employment"); *Smith v. Okolona Mun. Separate Sch. Dist.*, No. 1:97cv226-D-A, 1997 U.S. Dist. LEXIS 13518, at *4-5 (N.D. Miss. July 31, 1997) (denying preliminary injunction reinstating First Amendment plaintiff to prior job because "mere loss of income and reputation is an insufficient ground upon which to base irreparable harm").

Plaintiff has offered no proof she will suffer irreparable harm absent a preliminary injunction. Any loss of income is necessarily compensable and calculable if she prevails on her claim, and the record contains no proof of any unusual circumstances that have created or will create irreparable harm related to the loss of her job. Her Amended Complaint requests reinstatement as a potential remedy, but Plaintiff has offered no proof that she is entitled to that relief *immediately*, before the Court has even entered a case management order. She has identified no danger to the Court's "ability to render a meaningful decision on the merits," *Canal Authority*, 489 F.2d at 576, and she has not established that a judgment in her favor at the *end* of this litigation would be "too little, too late." *Sherpa*, 2026 U.S. Dist. LEXIS 4531, at *5.

Nor does Plaintiff's Motion seek to preserve the status quo. Her employment was terminated on September 11, 2025. Am. Compl., at ¶ 25 [3]; Tr., at 43:12-18. She first filed her Motion for Preliminary Injunction [4] seeking reinstatement on November 7, 2026. Notably, the plaintiffs in both recent district court cases cited in Plaintiff's briefing, Pl.'s Brf., at 12 [7], were still employed at the time they filed their respective motions for injunctive relief. *Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287, at *5 (D.S.D. Sep. 24, 2025) (granting temporary restraining order to employee still on administrative leave); *Crook v. Creston Comm. Sch. Dist.*, No. 4:25-373-RGE-HCA (S.D. Iowa Jan. 13, 2026) [Doc. 52] (granting preliminary injunction to maintain status quo for employee still on administrative

leave) (unpublished, attached as Appendix "1"). In fact, the court in the *Crook* case expressly declined the plaintiff's request for full reinstatement and instead ordered the employer to keep her on administrative leave, indicating that it would "preserve the status quo and go[] no further." *Id*. at 25.

The University terminated Plaintiff's employment on September 11, 2025. Am. Compl., at 1 [3]. The status quo at the time Plaintiff filed her Motion [4] was that she had been separated from employment with the University for nearly two months, and her replacement had already been offered the job. Plaintiff's former supervisor posted an open position for a new Executive Assistant around October 1, 2025, and extended a verbal offer to a candidate on October 27. Parks Decl. [17-1]. The new hire started work on November 10, 2025. *Id*. The Fifth Circuit has held that, when courts consider a request for reinstatement in the employment discrimination context, "innocent incumbents may not be displaced" except under extraordinary circumstances – even where reinstatement is sought as a *final* remedy after a jury verdict for the plaintiff. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490 (5th Cir. 2007). Plaintiff has identified no such circumstances.

Instead, Plaintiff argues that she need not offer proof she suffered irreparable harm because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Pl.'s Brf., at 15 [7] (citing *Mahmoud v. Taylor*, 606 U.S. 522 (2025)). Plaintiff is incorrect that the Court should *automatically* presume irreparable harm because she has alleged a First Amendment violation. As the Fifth Circuit has previously held, mere "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Plaintiff faces no such threat of such irreparable injury. Her termination occurred in

5

the past. Now, Plaintiff can post whatever she wants on her Instagram account, including her original September 10 post if she chose to do so. Tr., at 27:16-28:2.

Plaintiff has cited no authority holding that irreparable harm should be *presumed* where the plaintiff cannot prove a continuing threat of a constitutional deprivation. In *Elrod v. Burns*, a patronage dismissal case, the plurality opinion specifically noted that one of the named respondents and many members of the putative class had been threatened with termination but *not yet terminated* at the time the preliminary injunction was sought. 427 U.S. 347, 373 (1976) (plurality opinion). The plurality held that, "[s]ince such injury was *both threatened and occurring at the time of respondents' motion* and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief." *Id*. at 374 (emphasis added).

Likewise, the other cases cited in Plaintiff's briefing dealt with requests to enjoin *continuing* alleged constitutional violations. Pl.'s Brf., at 15 [7]; Pl.'s Reply, at 15 [21]. *See Mahmoud*, 606 U.S. at 569 (holding that parents of schoolchildren whose schools sought to introduce "LGBTQ+-inclusive" materials were entitled to a preliminary injunction because they "will continue to be put to a choice: either risk their child's exposure to burdensome instruction, or pay substantial sums for alternative educational services"); *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (finding irreparable harm in enjoining COVID-19 executive order restricting number of attendees at religious services); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (affirming preliminary injunction enjoining election code provision limiting acceptance of political contributions).

The Second Circuit recently addressed this issue in the First Amendment context in an

6

action challenging COVID-19 vaccine mandates for New York City employees. *See New Yorkers for Religious Liberty, Inc. v. City of N.Y.*, 125 F.4th 319, 329 (2d Cir. 2024). The plaintiffs "filed the at-issue motions for preliminary injunctions *after* they were terminated" and thus could not "show the 'specific present objective harm or a threat of specific future harm' required of them." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)) (emphasis in original). The Second Circuit rejected the same argument Plaintiff makes here, holding that "*Elrod* instructs that because Appellants here had already been terminated at the time of their preliminary injunction motions, they were not suffering ongoing harms or threats of harm. Having already been discharged, their harm is *compensable*, not *irreparable*." *Id.* (emphasis in original).

More recently, an Arkansas federal district court denied a motion for preliminary injunction seeking reinstatement of a public employee who was terminated after she made comments about Charlie Kirk's death on Facebook, holding that she could not demonstrate irreparable harm flowing from the loss of her job. *See Gray v. Mallory*, No. 4:25-cv-01057-LPR, 2025 U.S. Dist. LEXIS 229156, at \*\*2-14 (E.D. Ark. Nov. 21, 2025). The *Gray* Court noted that the plaintiff had "place[d] all her eggs in the presumption-of-irreparable-harm basket" by relying solely on what that court called the "*Elrod* maxim" – that is, the Supreme Court plurality's statement in that case that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at \*\*6-7. (citing *Elrod*, 427 U.S. at 373).

The Court then found that the "real question to be answered – inside and outside the First Amendment context – is whether a plaintiff can show that the challenged state action *will likely* threaten or violate her constitutional rights in the absence of preliminary relief," a situation "that is only possible where the constitutional harm is presently occurring or set to occur in the

7

imminent future." *Id*. at \*\*8-9. While the "*Elrod* maxim holds true in most First Amendment cases" because "most First Amendment cases seek to enjoin a law or regulation that is actively chilling a plaintiff's speech," the *Gray* court concluded that its case was different:

> Ms. Gray's challenge is not to a current or prospective law, regulation, or similar government action that is actively chilling (or imminently will begin chilling) her speech. Instead, Ms. Gray is challenging the Department's decision to terminate her from her job. That is a single, discrete act that took place entirely in the past. The Department is not currently chilling her speech. It can't be; she is no longer working for the Department. Therefore, the Department no longer has any power over her or her speech. At present, Ms. Gray can speak her mind without any fear of retribution from the Department of Health.

*Id*. at \*\*9-10. The plaintiff could not, the court held, "just point to *Elrod* and call it a day." *Id*. at \*14. Rather, she had to offer proof of irreparable harm, and she failed to do so. Plaintiff has likewise failed to meet her burden. She has merely cited *Elrod* and declared victory, but she has presented no proof of irreparable harm.

Plaintiff has suggested that her termination could have a chilling effect on some other "dissenting employee's speech." Pl.'s Reply, at 15 [21]. First, there is only one plaintiff in this lawsuit, and the only action she challenges is her termination, an act that occurred in the past. Second, even if Plaintiff had standing to challenge an unidentified University policy on behalf of other unnamed current University employees, no proof exists that any such employee currently faces any "imminent, non-speculative irreparable injury." *Google, Inc.*, 822 F.3d at 228. One witness testified vaguely that she "knew people who were feeling fear about what can I say and can't I say as a public employee," Tr., at 68:13-14, but another witness who knows Plaintiff personally and worked in the same office as Plaintiff testified that she is "very political" and "tend[s] to post a lot about world events, about things happening in the world." Tr., at 46:14-19. There is no First Amendment claim on behalf of any unnamed third party before the Court, and there is no proof of imminent irreparable harm. The Court should deny Plaintiff's Motion.

8

## 2. *The* Pickering *balance favors the Chancellor.*

In weighing the parties' interests, the Court should consider whether the speech was likely to generate controversy and disruption, whether it was likely to impede the general performance and operation of the University, whether it would affect working relationships necessary to the University's functions, whether Plaintiff's speech impeded the performance of her duties, and whether the speech could inflict reputational harm or reflect poorly on the University. *See Johnson v. Miller*, 126 F.4th 1020, 1030 (5th Cir. 2025); *Bevill v. Wheeler*, 103 F.4th 363, 378 (5th Cir. 2024); *McLin v. Twenty-First Judicial District*, 79 F.4th 411, 414 (5th Cir. 2023).

The record is replete with undisputed proof about the disruption caused by Plaintiff's social media post. Plaintiff testified that the reaction to her social media post disrupted her world and damaged her personally on the same night she posted it. Tr., at 37:22-38:13. She emailed Ms. Parks in the middle of the night and decided to go straight to the University's HR Department the next day because she knew the disruption would make it difficult for her to do her job. Tr., at 38:14-39:14; Ex. P-3, P-4. Plaintiff, her husband, and her business received harassing phone calls and emails, including bomb threats and death threats. Am. Compl., at ¶ 68 [3]. They closed their restaurant for two weeks, and they hired security for the first time when they reopened. Plaintiff left town for two and a half to three weeks. Tr., at 34:20-37:14. Plaintiff fully anticipated that the disruption in her personal life would spill over into the University community.

Just like Plaintiff, the University also received a large volume of messages criticizing Plaintiff's post and demanding action from the University. Stone Decl. [17-2]. The University Police Department had to patrol around the Development Office because employees were

9

frightened for their personal safety. Parks Decl. [17-2]; Boyce Decl. [17-3]. The University was forced to restrict its planned social media and communications and cancel a planned fundraising event. Parks Decl. [17-2]; Stone Decl. [17-2]. The Development Office had to bring in someone to perform Plaintiff's job duties and manage the crisis while planning for a major donor event the next day, and the Marketing and Communications Department had to devote substantial resources to assist other department and protect the University's reputation. *Id.*; Parks Decl. [17-2]; Tr., at 41:7-42.

The Chancellor knew of these disruptions and ultimately determined they justified Plaintiff's termination. Boyce Decl. [Doc. 17-3]. This is not a situation in which the Chancellor acted because of a "reasonable prediction" of disruption. *See Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 741 (5th Cir. 2015). The disruption was real and only stopped after the Chancellor made the decision to terminate Plaintiff's employment and issued a public statement. Stone Decl. [17-2]. Plaintiff's argument that the disruption was "external" misses the point. Pl.'s Reply, at 8 [21]. The Chancellor is not limited to considering disruption caused by the speaker themselves. Rather, reaction from the public is expressly part of the analysis. *See Johnson*, 126 F.4th at 1030 (holding that courts could consider "whether the speech was likely to generate controversy and disruption"); *McLin*, 79 F.4th at 420 (holding that impact to employer's public "image" was relevant to balancing). The pertinent facts in this case are nothing like those in *Rankin v. McPherson*, in which the Supreme Court noted that the defendant "testified that the possibility of interference with the functions of the [employer's] office had not been a consideration in his discharge of respondent and that he did not even inquire whether the remark had disrupted the work of the office." 483 U.S. 378, 389 (1987).

Plaintiff also argues that, "[e]ven if the University proved the kind of disruption that

10

justified action, there is no evidence it justified termination." Pl.'s Reply, at 12 [21]. Instead, she suggests the Chancellor should have kept her on administrative leave "to let things die down." *Id*. The Court should decline Plaintiff's invitation to substitute its judgment for the Chancellor's as to the appropriate course of action. Without dispute, the disruption to the University's operations stopped once Plaintiff was separated from the University and the University issued its statement. Stone Decl. [17-2]. Plaintiff also cites no authority requiring the University to *accommodate* the disruption caused by her social media post by excusing her from attending work until "things died down." As discussed above and in the Chancellor's earlier briefing, Plaintiff's ability to perform her regular duties is expressly part of the analysis.[1]

Plaintiff's proof at the February 13 hearing on her Motion leaned heavily on testimony about an on-campus event hosted by the University's student chapter of Turning Point USA (an organization with which Mr. Kirk was affiliated) on October 29, 2025. Her witnesses testified that the event, which was attended by the Vice President of the United States, led to cancellation of some classes and other inconveniences around campus. Tr., at 58:8-60:14; 66:17-68:7; 73:18-74:18; 93:12094:9. Witnesses also speculated, with no personal knowledge, that the Chancellor was involved in bringing that event to campus and approved of messages espoused by Turning Point USA. Tr., at 74:25-75:20. None of this testimony addressed the Chancellor's undisputed proof about the disruption caused on campus by Plaintiff's September 10 Instagram post or the reason he terminated Plaintiff's employment.

Plaintiff's witnesses, five out of six of whom did not personally know Plaintiff, also testified that they and other unnamed University employees and students were not aware of

---

[1] Plaintiff also suggests the Chancellor should have instead taken some lesser measures based on a progressive discipline policy, Pl.'s Reply, at 12 n.8 [21], but she does not allege, and there is no proof, that the University is required to follow a progressive discipline policy before any employee may be separated from employment.

11

Plaintiff's Instagram post until after her termination and that they only became aware of the termination after the Chancellor's public statement and that the statement was unusual. Tr., at 47:15-48:3; 57:21-58:4; 64:15-24. Again, this testimony does nothing to dispute the version of events described in the Chancellor's proof.

Plaintiff has failed to meaningfully address the Chancellor's proof of disruption. She cannot show that her interests outweighed the University's interest in maintaining an efficient workplace, and she is not likely to succeed on the merits of her First Amendment claim. The Court should deny her motion.

## CONCLUSION

Plaintiff has offered no proof that she faces a substantial threat of irreparable injury absent a preliminary injunction, and she has failed to rebut the Chancellor's proof about the disruption caused by her social media post. The Court should deny her Motion for Preliminary Injunction.

This, the 20th day of January 2026.

Respectfully submitted,

**GLENN BOYCE, CHANCELLOR OF THE UNIVERSITY OF MISSISSIPPI, in his official and personal capacities**

 */s/ J. Cal Mayo, Jr.*
J. CAL MAYO, JR. (MB NO. 8492)
PAUL B. WATKINS, JR. (MB NO. 102348)
*Attorneys for Defendant*

OF COUNSEL:

MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Tel: (662) 236-0055 | Fax: (662) 236-0035
*cmayo@mayomallette.com*
*pwatkins@mayomallette.com*